461 So.2d 1084 (1984)
Egbert L. WRIGHT
v.
OCEAN DRILLING AND EXPLORATION COMPANY.
No. CA 1963.
Court of Appeal of Louisiana, Fourth Circuit.
December 10, 1984.
*1085 Bruce C. Waltzer, Thomas M. DeRose, New Orleans, Joseph Cohn, St. Louis, for plaintiff-appellee.
Georges M. Legrand, Wilton E. Bland, III, Hebert & Abbott, New Orleans, for defendant-appellant.
Before GARRISON, BYRNES and LOBRANO, JJ.
GARRISON, Judge.
This is an appeal from a judgment of the district court rendered in accordance with a jury verdict dated October 17, 1984 granting damages in the amount of $216,000.00 plus legal interest and expert fees in favor of plaintiff, Egbert L. Wright and against defendant, Ocean Drilling and Exploration Company (Odeco). From that judgment, defendant appeals.
On appeal, defendant argues that the trial court jury erred in finding:
1. With respect to plaintiff's first accident, that the D/B Ocean King (King) was a vessel in navigation, that plaintiff was a seaman, that Odeco's negligence was a legal cause of the accident and that the plaintiff was only 10% negligent.
2. With respect to plaintiff's second accident, that the D/B Ocean Rover (Rover) was unseaworthy and that Odeco's negligence was a legal cause of the accident.
3. That the amount awarded is excessively high.
*1086 4. That the trial court erred in striking three of Odeco's witnesses and once having done so, erred in failing to grant a mistrial.
In February of 1982 plaintiff was employed as a motorman by Odeco[1] and was assigned to the King. The King was located in the Marathon Le Tourneau shipyard in Brownsville, Texas where it had been undergoing repairs for the past year. Plaintiff alleged and the jury apparently agreed that the rig was afloat on the waters adjacent to the shipyard, that the rig was capable of operating under its own power, that it was fully crewed and that the crew was completely housed and fed aboard the rig. Apparently the rig was substantially geared-up for its return to the Gulf of Mexico when plaintiff arrived. While onboard an additional problem developed when one of the rig's 8 ton generators became inoperable.
On April 11, 1982, plaintiff was ordered to unbolt the inoperative generator and remove it from the engine room to an adjacent compartment, the watermaker room, where an overhead deck crane could pick up the defective equipment. The engine room design failed to provide any means for the removal of the generator other than manual labor. There was no method of lowering a crane into the engine room, nor were there floor rails or an overhead trolley.[2]
Plaintiff's brief at pages 3-4 contains an excellent description of the process used to move the generator:
"The process of `walking' the generator out of the engine room involved attaching chainfalls to I-beams in the ceiling of the engine room some 10-12 feet above the deck, raising the generator by manually pulling on the chains of the chainfalls attached to the generator and then successively manually moving the chainfalls, one ahead of the other, to the watermaker room. The procedure necessitated several seamen on the deck of the engine room alternately to slacken and pull on the chains of the chainfalls attached to the generator and to attach the next chainfall to produce the desired movement, as well as several other seamen in the rafters overhead to detach a chainfall from the I-beams, move it ahead of the generator and lower the chainfall for attachment to the generator. The movement of the generator a distance of some 30 feet took 7 or 8 hours. The extreme difficulty of the work is evident from the uncontroverted fact that the seamen were only able to move the generator 3 or 4 feet per hour."
In the course of this operation plaintiff apparently hurt his back, but did not file an accident report or complain to his supervisor. Plaintiff finished his 12-hour shift and his tour and returned home in compliance with his "one week on-one week off" schedule. Plaintiff experienced back pain but thought that his back was only "sore" from a hard day's work. Plaintiffs condition became progressively worse. Plaintiff returned to work on the King and on May 9, 1982, reported the April 11th accident to the safetyman on the King.
On May 12th, plaintiff was transferred to the Rover at his request. Plaintiff traveled to Port Arthur, Texas where the Rover was located. He waited in Port Arthur for a few days in order that the rest of the crew could be flown in from Europe. When the crew was united, they reported to the Rover.
Plaintiff engaged in no heavy labor the first two days of work. On the third day he was instructed to prepare for removal of a recently inoperable generator. Unlike the King, the Rover was equipped with an overhead hatch through which a crane could be lowered. Preparation for removal of the generator included unbolting the 2,000 pound airblower and removing it from atop the generator. The toolpusher told Mr. Wright he had to remove the airblower in 45 minutes. No other personnel *1087 were assigned to assist Mr. Wright. To remove the airblower, Mr. Wright had to crawl on top of it, attach chainfalls to the I-beams in the ceiling of the engine room, and working alone, attach the chainfalls to the air blower, pull it up and off the generator, move the chainfalls overhead and slowly "walk" the air blower to a position out of the way.
Plaintiff finished his shift but was unable to sleep due to back pain. He reported to the safetyman who did not complete an accident report on the second injury as the safetyman felt it should be charged to the King. That same night plaintiff was transported to St. Mary's Hospital in Port Arthur, Texas where he was diagnosed as having intervertebral disc disease.
Turning to Odeco's fourth specification of error first, it should be noted that a sequestration order was entered at the commencement of trial.
Byron Bonck, a law student who works in the Claims Department at Odeco, attended the first day of trial. Mr. Bonck testified that he was not assigned to do so by Odeco, but had requested that he be allowed to attend and permission was granted. Mr. Bonck, who had not managed or read the file in the instant case, had never seen a case tried and felt the experience would further his legal education.
On the second day of trial, Mr. Bonck transported several witnesses to Civil District Court. During the ride to the courthouse, some conversation occurred between the witnesses and Mr. Bonck. Mr. Bonck testified:
"Okay. We didwe did discuss one aspect, and that was about his testimony, and I did make a reference to the fact that there was some contradictions about the facts. What he had said before. I'm going to speak frank about that." (Tr. Vol. III, p. 16).
The court further examined the three witnesses who were also party to the conversation. Lois Bailey denied that any conversation occurred. The second witness, Norman Rester, was somewhat evasive, as noted by the trial judge:
"A. Oh, I recall we might have said something between us, but like I say, I don't recall exactly what was said.
Q. I don't expect you to know exactly. I want you to tell me what was said by Mr. Bonck and yourself and the other members of the cab. You must remember that. That's less than an hour and a half ago.
A. Right. Right. That we were going intointo court, and thatI'll be honest with you. I just can't recall what was said. It was soyou know, I don't recall any specifics that was really pointed out.
Q. But you do acknowledge there was a discussion about the case?
A. Some kind of small discussion about the case. I can't recall what the specifics were.
* * * * * *
Q. But he was telling youhe was telling you something about what Mr. Wright testified to yesterday, isn't that right, sir?
A. It possibly might have been brought up, sir." (Tr. Vol. III, p. 30-33).
Likewise the trial court judge found that the other witnesses were less than candid. The trial judge ordered the court policeman to accompany Mr. Bonck to his car at the Odeco building and retrieve Mr. Bonck's notes. Upon examining the notes, the trial judge found that they were specific and responsive to particular witnesses observed by Mr. Bonck and did not deal with general trial tactics or general techniques of examination.
In order to impose sanctions for violation of the sequestration order, the court ordered that Odeco's witnesses could not testify. Counsel for Odeco moved for a mistrial instead and that motion was denied.
Choice of remedy imposed for violation of a sequestration order is within the discretion of the trial court judge and an appellate court should not substitute its *1088 own judgment for that of the trial court in the absence of prejudice to the extent that it would have substantially changed the outcome of the trial. Hopkins v. Dept. of Highways, 350 So.2d 1271 (App. 3rd, 1977); Benoit v. Camelle, 300 So.2d 850 (App. 3rd, 1974) writ denied 304 So.2d 668 (La.,1974). While mistrial is not totally unknown in civil trials, it is exceedingly rare and goes to actions before or actions of the jury. All of the above testimony, motions, etc. occurred outside of the presence of the jury, but for a brief instance when counsel asked the bench who Mr. Bonck was. This question was not unusual to the history of this particular trial, as the trial judge had asked various individuals who they were prior to this instance. The jury had seen Mr. Bonck sitting in the courtroom on the first day.
Odeco proffered the testimony of the witnesses, which testimony appears to be primarily "credibility"-type evidence. The trial judge must have concluded that the proffered testimony would not have substantially changed the outcome of the trial as he could have entered a judgment n.o.v. In view of the wide discretion granted the trial judge, this specification of error is without merit.
Odeco argues that the jury erred in concluding plaintiff was a Jones Act seaman and that the vessel was "in navigation" at the time of the accident and that the error is an error of law, as opposed to an error of fact. It is not. In order for plaintiff to have been a "seaman" the vessel must have been "in navigation" at the time. Odeco cites the testimony of Tony Murkowski, Manager of the Construction and Repair Division of Odeco that the rig was not operational until one or two days before it left the Marathon Shipyard on May 14, 1982one month after the accident. In contrast, plaintiff testified that the rig was operational when he first boarded the vessel and that a separate, distinct, and independent unexpected breakdown caused the rig to remain inshore for the additional month. It is clear that this is a credibility call situation and as such, it should not be disturbed absent manifest error.
Failure to exercise reasonable care to maintain a reasonably safe work environment is deemed negligence. Apparently, the jury found that Odeco failed to provide a reasonably safe work environment by not providing access for an overhead crane, or floor rails or an overhead trolley.
Odeco argues that plaintiff should be more than 10% negligent. The chains that were part of the rig's equipment were rusty and in ill-repair and they did not work as efficiently as well-oiled clean chains would have. Odeco's witness testified that plaintiff could have requested different chains but failed to do so. Plaintiff testified that the supervisor could have supplied clean chains. Percentage of fault determinations under comparative negligence have been held to be factual determinations and are thus subject to the manifest error rule.[3] It cannot be said that this percentage is manifestly or clearly erroneous.
Turning to the second accident, Odeco argues that it was error to have found Odeco negligent and the Rover unseaworthy.
The standard for unseaworthiness is stated in the lead case Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 551, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960) in which Justice Stewart as organ of the court stated:
"What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably *1089 suitable for her intended service. Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354."
In Mitchell, a crewmember slipped on a ship's rail which was covered with slime and fish gurry. The unseaworthy cases cited in Mitchell all deal with conditions of the vessel itself, i.e. defective equipment. In the instant case on the second accident, it does not appear to be a condition of the vessel itself, but rather an unreasonable policy, which caused the accident.
Theories of unseaworthiness and negligence are two separate and distinct basis of liability:
"From that day to this, the decisions of this Court have undeviatingly reflected an understanding that the owner's duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care. Pope & Talbot, Inc., v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120; Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354; Crumady v. The J.H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed. 413; United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541.

* * * * * *
There is ample room for argument, in the light of history, as to how the law of unseaworthiness should have or could have developed. Such theories might be made to fill a volume of logic. But, in view of the decision in this court over the last 15 years, we can find no room for argument as to what the law is. What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence. To hold otherwise would be to erase more than just a page of history." (Mitchell, above, at 932-933) (emphasis supplied).
Apparently the jury concluded that it was negligence for defendant to require one man to remove a 2,000 pound airblower in 45 minutes. Unlike the earlier accident, the jury found plaintiff free from negligence in this instance. Although the jury was incorrect on the unseaworthiness issue, it appears to have been correct on the negligence issue. This court reviews judgments, not reasons for judgments. Accordingly, the judgment is affirmed on this point.
Lastly defendant argues that the amount awarded is excessive. The personal injury damage cases routinely seen by this court use the "clear abuse of discretion" standard of Coco v. Winston Industries, 341 So.2d 332 (La., 1977) and Reck v. Stevens, 373 So.2d 498 (La., 1979). In the instant case, however, the standard for review of damage awards is different and is a stricter, more limited review.
In Sutton v. Central Gulf Lines, Inc., 433 So.2d 888, 891 (App. 5th, 1983), the Fifth Circuit Court of Appeal for the State of Louisiana stated in a Jones Act case:
"In reviewing damages awarded to injured seamen under the Jones Act, such awards will not be disturbed unless they are so large as to shock the judicial conscience or indicate bias, passion, prejudice, corruption or any other improper motive. Allen v. Seacoast Products, Inc., 623 F.2d 355 (5th Cir.1980)." (emphasis added).
Plaintiff is diagnosed as having thoracic degenerative joint disease and thoracic somatic dysfunction. He has been hospitalized three times and wears a Transcutaneous Electrical Nerve Stimulator (Tens) unit for the relief of pain. He is diagnosed as unable to return to his previous employment.
Plaintiff's economic expert testified that Mr. Wright's losses are as follows:

*1090
Past Lost Wages $ 26,271.00
Future Lost Wages $127,202.00[4]
Future Lost Meals $ 15,662.00[5]
 ___________
 $212,062.00

The jury awarded $240,000.00 prior to computation of plaintiff's 10% comparative negligence amount, which means that $27,938.00 equals the amount awarded for pain and suffering.
The award does not appear to be biased, prejudicial, or shocking to the conscience and, accordingly, should be affirmed.
For the reasons discussed, the judgment of the district court below is affirmed.
AFFIRMED.
NOTES
[1] Plaintiff had worked for Odeco on other rigs as far back as 1974.
[2] Apparently most rigs are equipped with one of these features specifically for the purpose of removing generators.
[3] Jones Act cases on review use the "clearly erroneous" test of Cooper v. Keyes Offshore, Inc., 421 So.2d 385 (App. 1st, 1982) instead of the manifest error test of Cantor v. Koehring Co., but the tests are identical.
[4] Future work life expectancy of 7 years to age 62 using a discount rate of 7.5% and crediting minimum wage earnings to that age.
[5] Meals are provided onboard the rigs.