STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-980


CLARENCE SMITH

VERSUS

WEEKS MARINE, INC., ET AL.


**********


APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 06-C-2019-A
HONORABLE JAMES PAUL DOHERTY, JR., DISTRICT JUDGE


**********


ULYSSES GENE THIBODEAUX
CHIEF JUDGE


**********


Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and
James T. Genovese, Judges.


AFFIRMED.


**Mark Gerard Artall**
**109 South College Road**
**Lafayette, LA 70505**
**Telephone: (337) 233-1777**
**COUNSEL FOR:**
    **Plaintiff/Appellee - Clarence Smith**


**Kevin Reeve Duck**
**Duck Law Firm**
**4906 Ambassador Caffery Pkwy., Bldg. J - Ste. 1010**
**Lafayette, LA 70508**
**Telephone: (337) 406-1144**
**COUNSEL FOR:**
    **Plaintiff/Appellee - Clarence Smith**

**Matthew Francis Popp**
**Waits, Emmett & Popp, L.L.C.**
**1515 Poydras Street, Suite 1950**
**New Orleans, LA 70112**
**Telephone:  (504) 581-1301**
**COUNSEL FOR:**
     **Defendant/Appellant - Weeks Marine, Inc.**

**THIBODEAUX, Chief Judge.**

The plaintiff-appellee, Clarence Smith (Mr. Smith), sustained multiple injuries while quartered on the barge of the defendant-appellant, Weeks Marine, Inc. (Weeks). In June of 2005, Mr. Smith was awakened after midnight by two other crew members who dragged him from his bunk and severely beat him. Mr. Smith filed a petition naming as defendants the two attackers and Weeks, the barge owner/employer. He subsequently amended his petition to add the employer/payroll company, apparently a subsidiary of Weeks, Atlantic Sounding Company, Inc. (Atlantic). Mr. Smith alleged Jones Act negligence and unseaworthiness of the vessel. He also claimed entitlement to maintenance and cure benefits as well as to damages and attorney fees.

Mr. Smith, Weeks, and Atlantic filed cross motions for summary judgment. The trial court granted Mr. Smith a partial summary judgment on the issue of Weeks' failure to provide a seaworthy vessel. The trial court denied the motions for summary judgment of Weeks and Atlantic which were based upon Jones Act negligence and seaworthiness. Weeks filed this appeal. We affirm the judgment of the trial court.

I.

## ISSUES

We must decide whether the trial court erred in finding the quarters barge unseaworthy based upon the attack of Mr. Smith and the criminal backgrounds of the crew members.

## II.

## <u>FACTS AND PROCEDURAL HISTORY</u>

On the morning of June 26, 2005, between 3:00 and 4:00 a.m., while Mr. Smith was asleep in his bunk on the quarters barge of Weeks, he was dragged from his bunk and attacked. One of his attackers was his roommate, crew member Tracey Collins, who was approximately six feet, six inches tall and weighed 236 pounds. Another crew member, Ashton Edwards, approximately six feet, one inch and 250 pounds, was in the room verbally and physically attacking Mr. Smith. Mr. Smith, approximately six feet tall and weighing 155 pounds, was thrown to the floor, punched, kicked, and rammed head-first into the iron bed rails and metal lockers.

Mr. Smith sustained a closed head injury, a concussion, lacerations to his forehead, a retinal tear and subconjunctivial hemorrhage of the left eye, abrasions of the lower lip, a fractured incisor, the loss of four teeth, temporomandibular jaw injury (TMJ), contusions to the left side of his chest and back, trauma to his right knee and shoulder, injuries to the lower back, post traumatic stress disorder, and depression. He could not return to work for approximately two months. Mr. Smith's medical treatment included a six-unit dental bridge and root canal, splint therapy for the TMJ, eye laser treatment for the repair of the detached retina, a lumbar diskectomy and fusion at L4-5 and L5-S1, and clinical therapy for the post traumatic stress disorder and depression.

The trial court granted Mr. Smith's motion for summary judgment on the unseaworthiness of the vessel and denied the defendants' motion for summary judgment on the issue of Jones Act negligence. Weeks filed a motion for reconsideration which was heard and denied in June of 2009. The trial court's June 2009 judgment denying the motion for reconsideration also designated the November

2

2008 judgment in favor of Mr. Smith a partial final judgment. Weeks appealed the June 2009 judgment.

## III.

## LAW AND DISCUSSION

### Standard of Review

A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law." *Sher v. Lafayette Ins. Co.*, 07-2441 p. 5 (La. 4/8/08), 988 So.2d 186, 192. Using the same criteria, courts review a grant or a denial of a motion for summary judgment de novo. *Id.*

### Jurisdictional Issue

We will first address the jurisdictional issue of whether the 2008 judgment was a final, appealable judgment under La.Code Civ.P. art 1915.[1]

---

[1]Article 1915 provides in pertinent part as follows:

> A. A final judgment may be rendered and signed by the court, even though it may not grant the successful party or parties all of the relief prayed for, or may not adjudicate all of the issues in the case, when the court:
>
> (1) Dismisses the suit as to less than all of the parties, defendants, third party plaintiffs, third party defendants, or intervenors.
>
> . . . .
>
> (3) Grants a motion for summary judgment, as provided by Articles 966 through 969, but not including a summary judgment granted pursuant to Article 966(E).
>
> . . . .
>
> (5) Signs a judgment on the issue of liability when that issue has been tried separately by the court
> . . . .

Mr. Smith's petition asserts a Jones Act negligence claim and a claim for unseaworthiness of the vessel. It further charges Weeks and Atlantic with failure to pay maintenance and cure benefits and asserts an entitlement to damages and attorney fees. Mr. Smith subsequently filed a "Motion and Order for Partial Summary Judgment on the Issue of Liability." However, the only liability issue addressed in the motion was for unseaworthiness of the vessel. At trial, counsel for Mr. Smith stated that if unseaworthiness were found, the court would not have to address the Jones Act negligence claims. However, Weeks argued that the court would have to deal with both. Weeks was correct. Mr. Smith actually asserted three separate theories of liability. Judge Belsome's concurrence in *Parfait v. Transocean Offshore, Inc.*, 04-1271, pp. 1-2 (La.App. 4 Cir. 8/10/07), 992 So.2d 465, 488-89, explained:

> I . . . concur with the majority's finding that the jury's determination that the *Rather* was seaworthy had no effect with regard to the jury's finding of negligence on the part of Transocean . . . as Jones Act negligence and unseaworthiness are separate and distinct causes of action with differing standards of proof, a principal [sic] that has been recognized by both the United States and Louisiana Supreme Courts, as well as this Court. *See, e.g., Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971); *Griffin v. LeCompte*, 471 So.2d 1382, 1387 (La.1985); *Wright v. Ocean Drilling and Exploration Co.*, 461 So.2d 1084, 1089 (La.App. 4 Cir.
>
> . . . .
>
> B. (1) When a court renders a partial judgment or partial summary judgment or sustains an exception in part, as to one or more but less than all of the claims, demands, issues, or theories . . . the judgment shall not constitute a final judgment unless it is designated as a final judgment by the court after an express determination that there is no just reason for delay.
>
> (2) In the absence of such a determination and designation, any order or decision which adjudicates fewer than all claims or the rights and liabilities of fewer than all the parties, shall not terminate the action as to any of the claims or parties and shall not constitute a final judgment for the purpose of an immediate appeal. Any such order or decision issued may be revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties.

1984) ("Theories of unseaworthiness and negligence are two separate and distinct basis [sic] of liability....' [I]n view of the decisions in this court over the last 15 years, we can find no room for argument as to what the law is. *What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence.*'") (quoting *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 551, 80 S.Ct. 926, 932-933, 4 L.Ed.2d 941 (1960)) (emphasis in original).

The concurrence footnoted other cases upholding this principle:

*Olsen v. American S.S. Co.*, 176 F.3d 891, 894, 2000 A.M.C. 90 (6th Cir. 1999) (stating that a seaman has three causes of action available to him: first, an action for maintenance and cure; second, an action for unseaworthiness; and third, a negligence action under the Jones Act); *Springborn v. American Commercial Barge Lines, Inc.*, 767 F.2d 89, 100 (5th Cir. 1985) (finding that "[w]hile the facts that give rise to unseaworthiness claims sometimes support Jones Act negligence claims, each is a distinct claim"); *Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62 (5th Cir. 1982) ("Jones Act negligence and unseaworthiness are two separate and distinct claims . . . . This court recognizes [these] two different standards of causation.").

*Parfait,* 992 So.2d at 494 n.1.

Accordingly, the motion that was granted by the trial court, and the trial court's judgment in favor of Mr. Smith on the issue of unseaworthiness alone, resulted in the adjudication of one claim or theory of liability only. The judgment did not dismiss any party to the suit under La.Code Civ.P. art. 1915(A)(1), nor did it qualify as a final and immediately appealable judgment under La.Code Civ.P. art. 1915(A)(3) because it falls under that subpart's exception for summary judgments granted pursuant to La.Code Civ.P. art. 966(E) (disposing of one claim but not of the entire case). Further, the judgment does not qualify as an immediately appealable final judgment under art. 1915(A)(5) because, while the motion's title indicates that it seeks to dispose of the issue of liability, indicating that damages will be tried

separately, it actually seeks to dispose of only one of three issues of liability asserted in Mr. Smith's petition.

Therefore, the partial summary judgment granted in favor of Mr. Smith, which adjudicates fewer than all claims or the rights and liabilities of fewer than all parties is not an immediately appealable final judgment under La.Code Civ.P. art. 1915(A), but may be immediately appealable under 1915(B), *if* it is certified or designated as a final judgment by the trial court after an express determination that there is no just reason for delay. La.Code Civ.P. art. 1915(B)(1) & (2). In the present case, the trial court did not initially certify the November 2008 judgment in favor of Mr. Smith and against Weeks on the issue of unseaworthiness as final. Therefore, the judgment was interlocutory and could be "revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties." La.Code Civ.P. art. 1915(B)(2).

However, following the hearing on the defendants' motion for reconsideration of the 2008 judgment, the trial court entered a judgment on June 15, 2009, denying reconsideration and certifying the prior judgment as final. It is this June 2009 judgment that is before us on appeal. Specifically, the trial court stated in the 2009 judgment, as follows: "[T]he judgment signed and filed on November 5, 2008, granting Summary Judgment in favor of Plaintiff on the Unseaworthiness Cause of Action is hereby made a final judgment." Two weeks later, on July 2, 2009, the trial court issued *written reasons* for its judgment denying reconsideration *and for its certification of the earlier judgment as a final judgment*, based upon its opinion that "there was no just reason for delay." The question for us on the jurisdictional issue then becomes whether the trial court's certification of the 2008 judgment as a final, immediately appealable judgment was appropriate or defective. Ancillary

6

questions arise as to whether the proper vehicle would have been an application for supervisory writs, whether the appeal should be dismissed, or converted to a writ, which is allowed in certain circumstances,[2] or whether a remand to the trial court is required; and, if the appeal is properly before us, what is the standard under which we conduct our review.

In order to resolve a split in the Louisiana circuit courts of appeal in interpreting the certification language of Article 1915, the Louisiana Supreme Court conducted an in-depth analysis of the legislative intent underlying the 1997 amendments to La.Code Civ.P. art. 1915, as those amendments were clearly patterned after Federal Rule of Civil Procedure 54(b). That analysis, appearing in *R.J. Messinger, Inc. v. Rosenblum*, 04-1664 (La. 3/2/05), 894 So.2d 1113, is instructive and determinative of the jurisdictional issue before us. There, the court stated, in pertinent part, as follows:

> Historically, we have a policy against multiple appeals and piecemeal litigation. We also ensure that our courts operate under principles of sound judicial administration to promote judicial efficiency and economy. The United States Supreme Court, discussing determination of whether there is no just reason for delay under Fed. R. Civ. Pro. 54, declared a district court must take into account judicial administrative interests as well as the equities involved. *Curtiss-Wright*, 446 U.S. at 8, 100 S.Ct. at 1465. Consideration of judicial administrative interests is necessary to assure that application of the Rule effectively "preserves the historic federal policy against piecemeal appeals." *Id.* citing *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438, 76 S.Ct. 895, 901, 100 L.Ed. 1297 (1956). Article 1915, like Rule 54, attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties. . . .

---

[2] *See* La.Code Civ.P. art. 2164; *Yell v. Sumich*, 08-296 (La.App. 3 Cir. 10/15/08), 997 So.2d 69; *LeBlanc v. LeBlanc*, 05-212 (La.App. 3 Cir. 11/02/05), 915 So.2d 966; *Stelluto v. Stelluto*, 05-74 (La. 6/29/05), 914 So.2d 34.

7

In order to assist the appellate court in its review of designated final judgments, *the trial court should give explicit reasons, either oral or written, for its determination that there is no just reason for delay. However, if the trial court fails to do so, we find the appellate court cannot summarily dismiss the appeal. For purposes of judicial efficiency and economy, we approve the approach taken by the First, Third and Fifth circuits, and hold the proper standard of review for an order designating a judgment as final for appeal purposes when accompanied by explicit reasons is whether the trial court abused its discretion.* . . . The following list of factors, although not exclusive, may be used by trial judges when considering whether a partial judgment should be certified as appealable:

> 1) The relationship between the adjudicated and unadjudicated claims;
>
> 2) The possibility that the need for review might or might not be mooted by future developments in the trial court;
>
> 3) The possibility that the reviewing court might be obliged to consider the same issue a second time; and
>
> 4) Miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Allis-Chalmers*, 521 F.2d at 364.

However, the overriding inquiry for the trial court is whether there is no just reason for delay. Courts of appeal, when conducting *de novo* review in matters where the trial court fails to give explicit reasons for the certification, can consider these same criteria.

Our interpretation of article 1915, which holds the certified final judgment is properly before the appellate court even when the trial court fails to give explicit reasons for its determination, is in accordance with La.Code Civ.Pro. art. 5051 which provides "[t]he articles of this Code are to be construed liberally, and with due regard for the fact that rules of procedure implement substantive law and are not an end in themselves."

*R.J. Messinger, Inc.*, 894 So.2d at 1122-23 (footnote omitted) (emphasis added).

In the present case, the trial court gave explicit written reasons for denying reconsideration, for certifying the 2008 judgment as final, and for the court's determination that there was no just reason for delay. More specifically, the trial court stated, in pertinent part, as follows:

> Lastly, the judgment of [November 5, 2008] was designated as a final judgment because the Court, in the original motion for summary judgment and in the motion for reconsideration, found that the hiring of Tracey Collins as a crewman constituted an unseaworthy condition and that finding was not contested or raised in the defendant's motion for reconsideration. Further, there was no testimony from Mr. Collins concerning his participation that would have given rise to an issue of material [] fact as to what had occurred. The Court assigned finality to the judgment based on its opinion that there was no just reason for delay and that the trial of this matter was to begin two days later. The Court further stated for the record that it did not see any prejudice to the defendant in denying the motion for reconsideration that was filed within 60 days of the setting of the trial and judgment being rendered two days prior to the beginning of the taking of evidence.

Based upon the foregoing, we review the trial court's certification of the 2008 judgment under the abuse of discretion standard. We find that the trial court did not abuse its discretion and that it properly designated as final the 2008 judgment granting partial summary judgment to Mr. Smith. The trial court provided explicit written reasons for its determination under Article 1915 that there was no just reason to delay certifying the judgment in favor of Mr. Smith as a final judgment. The court stated that nothing in the original hearing on the motion for summary judgment, and nothing in the hearing on reconsideration, created a material issue of fact, where it was undisputed that at least one of the co-defendants, Collins, attacked Mr. Smith, and where the hiring of Collins as a member of the vessel's crew, in view of his prior record of violence, "constituted the unseaworthy condition." Further, we note that the trial court in its reasons did address the upcoming trial just days away, and,

pursuant to number four (4) of the *Allis-Chalmers* factors, giving finality to the issue of unseaworthiness would shorten the trial and prevent rehashing the evidence on that issue.

## The Merits

We will conduct a de novo review of the trial court's granting of the summary judgment in favor of Mr. Smith. Weeks contends that the trial court erred as a matter of law in finding that the quarters barge was unseaworthy based upon the assault and the criminal backgrounds of the crew members. We disagree. In *Miles v. Melrose*, 882 F.2d 976, 981 (5th Cir. 1989) (citations omitted) (footnotes omitted), the court explained the ship owner's absolute duty to provide a seaworthy vessel and crew:

> A ship is unseaworthy unless it and all of its appurtenances and crew are reasonably fit and safe for their intended purpose. The shipowner has an absolute duty to provide the members of his crew with such a seaworthy vessel, an obligation not dependent on fault. Just as a dangerous mast, a defective line, or a damaged hull may render a vessel unseaworthy, so may a seaman who is not reasonably fit. To establish such unseaworthiness, a plaintiff must prove that the crew member was not "equal in disposition and seamanship to the ordinary men in the calling." Under this standard a crew member who participates in an "ordinary sailors' brawl" is not per se unfit; the rigors of work at sea for long periods of time in the close confines of a vessel may lead not only to quarrels but to physical challenges. As Judge Learned Hand explained, "Sailors lead a rough life and are more apt to use their fists than office employees; what will seem to sedentary and protected persons an insufficient provocation for a personal encounter, is not the measure of the 'disposition' of 'the ordinary men in the calling.'" A seaman is not unfit merely because he is irascible; he fails to meet the seaworthy standard only if he [possesses] a savage and vicious nature.

Collins' criminal arrest and conviction history, spanning the years from 1993 to the attack on Mr. Smith in 2005, included the following:

10/93 **Simple battery**

6/94 Four counts simple burglary and criminal damage to property

9/94 **Disturbing peace, resisting arrest, battery on police officer**

2/95 Receiving stolen goods - guilty - 4/95

4/95 **Disturbing the peace by fighting**

4/97 Criminal damage to property, resisting arrest by flight

5/97 Simple criminal damage to property

6/97 **Criminal trespass and simple battery** - pled guilty - 12/98

7/97 Two counts criminal trespass and resisting arrest by flight

8/97 **Simple battery**, choked and hit woman -guilty plea - 10/98

8/97 **Aggravated assault with a dangerous weapon**

8/97 Possession of Marijuana

9/98 **Aggravated battery upon a police officer and resisting arrest**, hit officer in the head with a beer bottle - guilty plea  - 12/98

4/00 Disturbing the peace

8/00 **Simple battery upon a police officer**

9/00 **Two counts of simple battery**, actually included two batteries on a woman and one on a man (second attack on woman hours later not counted as separate) plead guilty - 4/01

9/00 Unauthorized entry of inhabited dwelling

9/00 Violation of Protective Order

10/00 **Simple battery, resisting an officer, flight from officer,** and simple criminal damage to property

8/01 Simple robbery

Ten of these arrests were for acts of violence against another person, at times more than one person, and three of the batteries were against police officers.

The criminal history of Edwards contained fewer events but involved firearms:

> 9/93 **Two counts of attempted 2nd degree murder, pled to aggravated assault;** chased and shot at his father twice with a twelve gauge shotgun; threatened to kill his father and mother
>
> 5/00 **Aggravated assault of Gerald Collins with a firearm** and disturbing the peace, threats with semi automatic rifle occurred on property of Gerald Collins, with Collins family, including Tracey Collins, providing information to the police

Weeks has admitted that both men have criminal histories but argues that they did not exhibit violent tendencies during their employment, nor did the criminal histories show up on the background checks performed by Weeks. However, for many years the courts have enunciated a concept of *absolute* liability for unseaworthiness. The plaintiff has a right of recovery for injuries arising from an unseaworthy ship even though there is no means of anticipating trouble. The ship is not freed from liability by mere due diligence, and the duty to provide a seaworthy ship does not at all depend upon the negligence of the shipowner or his agents. Under maritime law there is an absolute obligation to provide a seaworthy vessel and, in default thereof, liability follows for any injuries caused by the breach of the obligation. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 80 S.Ct. 926 (1960).

Hence, the vessel owner's liability for the incompetency of the crew is not dependent upon the knowledge by the owner of such deficiency as the warranty extends to unknown defects. *Keen v. Overseas Tankship, Corp.*, 194 F.2d 515, *cert. denied*, 343 U.S. 966, 72 S.Ct. 1061 (1952). The shipowner's duty to provide a seaworthy vessel is nondelegable and pertains to latent as well as patent defects, and

12

neither ignorance nor due diligence will serve as an adequate defense. *Clevenger v. Star Fish & Oyster Co.,* 325 F.2d 397 (C.A.Ala. 1963).

Mr. Smith testified in his video deposition that Collins and Edwards came into his room around 4:00 a.m. and started attacking him in his sleep, accusing him of calling Edwards' wife and of stealing ten dollars from Collins after he fell in the water earlier and left the money out to dry. Both men had been out partying and smelled of alcohol. Mr. Smith said that he had never met or talked to Edwards' wife and did not take Collins' ten dollars. He stated that the attack woke him up, and he turned over to see Collins over him. He testified that he was pulled from his bed, stomped on and kicked, and rammed into the iron bed and metal lockers. When his brother tried to come in, they barricaded the door by putting a chair under the door knob. Mr. Smith was beaten on the head, in the eye, in the mouth, ribs, and back. Several teeth were knocked out, and he swallowed one.

At one point, Mr. Smith lost consciousness. He testified that, near the end of the attack, Edwards threatened him with an open knife, hit him in the back with the knife, and rubbed the blade on his leg, causing a small cut which left a scar. Mr. Smith stated that in threatening him with the knife, Edwards said, "I'll kill you, if you say something to anybody, I'll kill your ass."

Lieutenant James Michael Prestenback came to the hospital after the attack. He witnessed the bruising on Mr. Smith's back, the dried blood in his ear, the cut on his lip, and a loose tooth on his pallet. He stated that Mr. Smith's injuries were the result of a felony, specifically a second degree battery, which is a battery committed upon a person without his consent, where there is a loss of consciousness, extreme physical pain, obvious disfigurement, and serious bodily injury. The Lieutenant interviewed the emergency room physician who diagnosed a closed head

injury, a laceration closed by stitches, and contusions/bruising caused by a blunt object.

Mr. Smith's brother, Christopher Smith, who was on the job and quartered on the same barge as Mr. Smith, testified that Edwards came to his room asking which of the brothers had called his "old lady." Edwards then said, "You better come and check up on your brother, because I'm about to hurt him." A while later, when Christopher went to Mr. Smith's room, he could not open the door. He started knocking, and they finally let him in, at which time he saw his brother slumped over with his knees to his chest, bleeding, while the men huddled over him, staring down at him.

Citing *Walters v. Moore-McCormack Lines, Inc.*, 309 F.2d 191 (C.A.N.Y. 1962), and *Clevenger,* 325 F.2d 397, Weeks argues that the actions of the crewmen against Mr. Smith do not rise to the level of savage and vicious because no dangerous weapons were used. We disagree. The court in *Walters* stated:

> In those assault cases in which the issue of unseaworthiness has been held properly submissible to a jury, the hallmark has been either an assault with a dangerous weapon or independent evidence of the assailant's exceptionally quarrelsome nature, his habitual drunkenness, his severe personality disorder, or other similar factors. . . .

> In the case before us, we need not rest our holding upon the absence of a dangerous weapon, for aside from the unfortunate instant encounter, there is no evidence to support a finding of a background of even mildly unusual character on the part of Shannon, let alone a vicious and savage one. While it is true that in 1936, Shannon, along with other individuals, entered a plea of guilty to an assault charge arising from a maritime labor dispute and received a six-month sentence with time off for good behavior, he was employed by the defendant in 1938, and served without incident for twenty years, until the date of this shipboard fracas. There was no testimony whatever of any previous display of ill temper by Shannon.

14

*Walters,* 309 F.2d at 193-94.

However, unlike the assailant in *Walters*, Collins did not have a twenty-year history of non-violence with Weeks. He had worked for Weeks for only six months when the attack on Mr. Smith occurred. Collins had an eight-year record in Louisiana, from 1993 to 2001, with more than twenty arrests and ten battery charges, three of which were on police officers. Even during the "simple robbery" in 2001, which is not counted as a battery, Collins used force: he grabbed a man and held him down while stealing his money, knowing that the man had just cashed his paycheck, because Collins had robbed him on payday before. Moreover, while there appears to be a peaceful period in Collins' life between 2001 and 2005, when the second degree battery on Mr. Smith occurred, we note that Collins lived in Houston when he started to work for Weeks in Louisiana in December of 2004, and we do not know whether anyone conducted a criminal record search on Collins in Texas.

The court in *Clevenger* provided examples of actions falling on both sides of the seaworthiness issue:

> In *Jones v. Lykes Bros. S.S. Co., Inc.*, 2 Cir. 1953, 204 F.2d 81[5], [*cert. denied*, 346 U.S. 857, 74 S.Ct. 72 (1953),] a crew member gave the libellant a bad beating, continuing his blows even after the libellant had fallen. The assailant was not known to have a violent nature and used only his fists. The Court reaffirmed the Keen test although it reversed the finding of unseaworthiness. Judge Hand pointed out: 'All men are to some degree irascible * * *. Sailors lead a rough life and are more apt to use their fists than office employees'. On the facts, there was nothing to show that the assailant was not 'equal in disposition and seamanship to the ordinary men in the calling'.

> In *Boudoin v. Lykes Bros. S.S. Co., Inc.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354, the Supreme Court accepted the theory of unseaworthiness based on personnel falling below the standards of the calling. Boudoin's injury was inflicted by a deck maintenance man named Gonzales who entered Boudoin's cabin during a nighttime

15

drinking party in search of a bottle of brandy. Boudoin awoke and startled Gonzales who attacked him savagely with the brandy bottle, inflicting grave injuries. The district court found that Gonzales was 'a person of dangerous propensities and proclivities', 'a person of violent character, belligerent disposition, excessive drinking habits, disposed to fighting and making threats and assaults'. *Boudoin v. Lykes Bros. S.S. Co., Inc.*, E.D.La.1953, 112 F.Supp. 177 at 179. . . .

A number of cases have applied the Keen test as restated in *Boudoin*. In *Kelcey v. Tankers Co.*, 2 Cir. 1954, 217 F.2d 541, the libellant was attacked by the second cook. The attacker was a much more powerful man, had served a sentence for an attack with a deadly weapon while in the Navy, and had previously threatened men aboard ship with a knife and with an axe. The Court affirmed the finding of unseaworthiness. In *Connolly v. Farrell Lines, Inc.*, 1 Cir. 1959, 268 F.2d 653, [*cert. denied*, 361 U.S. 902, 80 S.Ct. 208 (1959),] however, the Court sustained the trial judge's directed verdict for the shipowner where the plaintiff was injured as a result of an attack by a fellow crew member wielding a three foot plank. But the plaintiff had at hand the neck of a broken bottle. The shipowner is not liable, said the court, for 'injuries resulting from every sailor's brawl. * * * This was not a premeditated attack with an unmistakably deadly weapon such as a meat cleaver. In *Walters v. Moore-McCormack Lines, Inc.*, 2 Cir. 1962, 309 F.2d 191, the court, over a vigorous dissent by Judge Friendly, concluded that an attack by one seaman upon another did not justify the submission of the question of seaworthiness to a jury.

. . . .

The attacker used only his fists and there was no evidence of earlier trouble. *In Thompson v. Coastal Oil Co.*, N.J.1954, 119 F.Supp. 838 *rev'd on other grounds*, 3 Cir. 1955, 221 F.2d 559, the libellant accused an effeminate messman of being a homosexual. The messman hid in a doorway and struck the libellant three times over the head with a meat cleaver. The district court, sitting without a jury, found that the presence of the messman rendered the vessel unseaworthy. Similarly, the fact that a ship's crew included a belligerent man who would stab a fellow crew member with a pocket knife rendered the ship unseaworthy in *Handley v. United States*, S.D.N.Y.1958, 157 F.Supp. 616.

The doctrine that a seaman's attack is a breach of the warranty of seaworthiness applies to an unprovoked attack by a longshoreman on a fellow longshoreman. A longshoreman's use of two cargo hooks was seen as sufficiently vicious to allow a jury to consider the question of seaworthiness. *Smith v. Lauritzen, E.D.Penn.*1962, 201 F.Supp. 663.

In all of these cases, as Mr. Justice Douglas put it in *Boudoin*, the question is: 'Was the assault within the usual and customary standards of the calling'. We extract from the cases the principle that in itself a savage assault with a meat cleaver or similarly dangerous weapon can be sufficient proof that the attacker is 'not equal in disposition and seamanship to the ordinary men in the calling'. Drunkenness and bellicosity are additional factors to consider when the nature of the assault is inconclusive evidence of the attacker's fitness in terms of his calling.

*Clevenger,* 325 F.2d at 400-402.

Contrary to Weeks' assertions, this case is analogous to the above cases, where unseaworthiness was found and is distinguishable from the ones where the court failed to find unseaworthiness. More specifically, unlike the assailant in *Jones*, Collins used more than his fists. He also used the floor, the iron bed rails, the metal locker, his size and weight, and his feet to inflict serious injuries upon Mr. Smith. Further, he had a long record of violence. Moreover, Mr. Smith testified that Edwards used a knife, which is a dangerous weapon, and threatened to kill him. Like the attacker in *Boudoin*, Collins had a violent character and belligerent disposition: he had been convicted of choking and hitting a woman and a man, and then coming back on the same day and hitting the woman again. He had a history of getting drunk and starting fights. He was drinking when he attacked Mr. Smith, and he had previously hit a police officer in the head with a beer bottle. One of the police officers wrote in his report that Collins was always causing trouble for the police, resisting arrest, and running into the woods to avoid being caught. Collins was

clearly disposed to fighting and making threats. Edwards had a much shorter record but had actually shot at his parents and threatened to kill them.

Again, like the attacker in *Kelcey*, Collins was a much more powerful man than Mr. Smith, with a nine-year, six-inch, and about eighty-pound advantage over him. Further, Collins had at least ten battery and assault charges on his record. Likewise, Edwards had nearly a hundred-pound advantage over Mr. Smith, used a knife on him, and threatened to kill him. Unlike the incident in the *Connolly* case above, where the plaintiff had a broken beer bottle and the attacker had a board, Mr. Smith was not in an one-on-one sailor's brawl; he was asleep, unarmed, outnumbered, and outweighed by about 180 pounds.

We find that these men's actions, coupled with criminal records of violence, were indicative of a savage and vicious nature, far beyond the simply rowdy disposition of ordinary seamen. This is particularly true of Collins. Historically, he choked and beat his girlfriend repeatedly, bullied and stole pay checks from men, hit police officers with beer bottles, and he had a long history of engaging in fights and disturbances.

Weeks' argument that the conduct of Collins and Edwards was the same as other men in the calling has no merit. It is ludicrous to suggest that, in addition to the everyday safety risks of manual labor on barges and oil rigs, the industry has a standard hiring practice of employing violent men who beat their sleeping, defenseless, and unconscious co-workers so badly that they cannot work for two months. What industry could survive the resulting disability of its workforce? Collins in particular did not have the disposition of an ordinary seaman; he was not fit for service, and his being quartered on the QB-105 rendered the vessel of Weeks

18

unseaworthy.  There was no error in the trial court's judgment granting Mr. Smith's motion for summary judgment on the issue of unseaworthiness.

Following the hearing on the motion for summary judgment, Weeks took the deposition of Edwards, who denied striking Mr. Smith with his fists.  However, Edwards admitted to being mad, hot, drunk, and going to Mr. Smith's room to tell him off.  Apparently several crewmen, including Mr. Smith, Collins, and Edwards, were out drinking in the same club the night before the incident.  Edwards was "messing with" or flirting with various women, and Mr. Smith told the women outside the club that they should not be fooling around with Edwards because he was married.  Edwards was incensed that Mr. Smith would spoil his fun in this way and apparently got angrier after returning to quarters.

Edwards testified that he did not remember the details of what occurred in Mr. Smith's room because he had been drinking.  He stated that Mr. Smith and Collins were standing up arguing when he entered the room and that Mr. Smith had a "bust" lip and looked like he had been in a fight.  Edwards testified that he argued with Mr. Smith and admitted that he may have brushed against Mr. Smith and put his hands on him.  Edwards physically demonstrated some other movement made by him against Mr. Smith which was not clarified in the written record except by the lawyer examining him, who stated, "Well, there's a punch.  There's a grab."  Edwards denied punching Mr. Smith but also testified that he subsequently apologized to Mr. Smith for the "accident" and further testified that his wife paid Mr. Smith a thousand dollars to drop the criminal charges.

Weeks had filed a pre-trial statement of uncontested facts indicating that both Collins and Edwards had attacked Mr. Smith.  However, on the basis of Edwards' deposition, Weeks brought a motion for reconsideration, asserting that this

19

testimony created a genuine issue of fact requiring a reversal of the summary judgment in favor of Mr. Smith.

The trial court found that the testimony of Edwards did not create a material issue of fact and denied the motion for reconsideration, stating as follows:

> Nothing in the defendant's motion for reconsideration brought into issue the actions and past history of co-defendant Tracey Collins. Even if Mr. Edwards had not been involved, which the Court finds not to be the case as hereinafter set forth, the undisputed facts, both at the time of granting of the original motion for summary judgment and at the time of the motion for reconsideration, was that Tracey Collins did participate, if not perpetuated, the attack on the plaintiff; Tracey Collins had a prior history of violence and hiring Tracey Collins as a member of the vessel's crew constituted the unseaworthy condition.

We agree. Given the history and the size of Collins, and the fact that Mr. Smith was asleep and defenseless, Edwards' participation or non-participation in the beating, while it created a fact in dispute at the hearing for reconsideration, that fact was not material with regard to the seaworthiness of the vessel. As the trial court stated, one bad apple ruins the whole barrel. Weeks further argues that the trial court erred in making credibility determinations about Edwards.[3] The trial court's comment that it did not find Edwards' testimony to be credible was inappropriate. Nonetheless, based upon our de novo review, summary judgment is still justified. The trial court repeatedly stated that Edwards' testimony, the sole basis for the motion to reconsider, had no bearing on the effect of Collins' actions. Therefore, we find that the trial court's statement regarding its disbelief in part of Edwards' testimony was harmless

---

[3]The trial court stated in its reasons for judgment: "[A]lthough a motion for summary judgment is not used to judge the veracity or credibility of a witness, this case was tried as a bench trial and the trier of fact, having had the opportunity to read the deposition testimony of defendant Edwards, did not find his testimony to be truthful or credible, particularly when he testified as to his activities or lack of participation in the encounter with the plaintiff."

20

error at most, where the court's legal analysis of the materiality of the testimony was correct.

## IV.

## <u>CONCLUSION</u>

Based upon the foregoing, we affirm the judgment granting Mr. Smith's motion for partial summary judgment on the issue of unseaworthiness. All costs of this appeal are assessed against Weeks.

**AFFIRMED.**