Michael G. OLSEN, Plaintiff–
Appellant,

v.

AMERICAN STEAMSHIP COMPANY,
Defendant–Appellee.

No. 98–1030.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 5, 1999.

Decided May 12, 1999.

Rehearing and Suggestion for Rehearing
En Banc Denied June 30, 1999.

Donald A. Krispin, Robert J. Allen (briefed), Michael J. Conner (argued and briefed), Jaques Admiralty Law Firm, Detroit, Michigan, for Plaintiff–Appellant.

Thomas W. Emery (argued and briefed), David M. Shafer (briefed), Allison L. Hoff (briefed), Garan, Lucow, Miller & Seward, Detroit, Michigan, for Defendant–Appellee.

Before: SILER, BATCHELDER, and COLE, Circuit Judges.

## OPINION

COLE, Circuit Judge.

Plaintiff Michael Olsen filed suit under the Jones Act, 46 U.S.C.App. § 688 *et seq.*, and under general admiralty law against defendant American Steamship Co. seeking damages relating to a heart attack he suffered while in the company's employ. Specifically, Olsen alleged that the ship on which he served was unseaworthy and that the defendant was negligent because it breached its duty to provide prompt and adequate medical care. Following a jury verdict in favor of the defendant, Olsen brings this appeal. Most notably, he asserts that the district court erred by limiting the testimony of one of his expert witnesses. For the following reasons, we **AFFIRM** the judgment of the district court.

### I.

On the morning of July 5, 1995, while his ship the M/V Sam Laud was docked in the port of Waukegon, Illinois, deckhand Michael Olsen and another shipmate were asked to work overtime cleaning the ship's

cargo holds, which Olsen described as a nasty job.[1] A Great Lakes freighter, the M/V Sam Laud carries in its five holds gypsum, sand, and other raw materials mined in the region. During the process of off-loading, the holds' pitched sides vibrate to shake the cargo down to a conveyor belt. This procedure is not perfect, however. Some cargo invariably sticks in the holds' nooks and crannies, requiring deckhands to climb down fifty-foot ladders to remove it manually, usually with garden hoes. Each deckhand wears a safety belt and, upon reaching the bottom of a hold, clips the belt on to one of various chains located throughout the space so that he can safely clamber around the sloped sides knocking cargo down to the bottom.

As Olsen and his partner began this work, the temperature inside the poorly ventilated holds was a humid 100–plus degrees. The cargo that day was particularly sticky, and Olsen and his partner were asked to re-enter some of the holds because some of the cargo they knocked down adhered to the conveyors. These conditions, while difficult, were apparently not unusual. The men could take a break whenever they needed, and they had water both to drink and pour over themselves.

At some point while performing this task, Olsen began to feel ill. Up on the deck, he walked over to a vent, hoping to cool off. The ship's captain happened by and asked Olsen if he was all right. Olsen said that he thought so. At trial, he testified that, in fact, he was unconcerned about his symptoms at this point, believing that his malady would clear up. After

Olsen had rested for a while, he re-entered the holds to finish the job. When it was complete, Olsen went back to the same spot on the deck. After sitting there for a while, he discovered that he could not pick his head up off his chest. Olsen informed the watchman (i.e. his supervisor) that he would be unable to continue working (the next task was to wash down the holds) and returned to his quarters.

Olsen did not work his next watch. The ship set sail, but before it arrived in its next port, Grand Haven, Michigan, third mate Kenny Bellmore informed Olsen that the captain was taking Olsen to see the doctor. At the North Ottawa Community Hospital, Olsen complained of the following symptoms: aching teeth, prickly arms, a burning sensation in his chest, and difficulty walking. Dr. L. Michael Sterenberg concluded, after examining Olsen, that he was dehydrated. The doctor gave Olsen an intravenous saline solution, telling him to drink lots of fluids and to take it easy for a day.[2]

Olsen reported that he felt better after he received the fluids. When he returned to the vessel, the morning of July 6, it was almost time for his morning watch, but he was allowed to rest. Olsen did not tell the captain or anyone else that he was unfit for duty, although he did tell the captain that he was "still not normal." At around 4:00 p.m., Olsen was asked to perform his afternoon watch. The ship was underway again, and he was assigned the duty of painting the smokestacks. The temperature near the stacks was close to two hundred degrees.[3] Olsen felt very weak,

---

**1.** A deckhand's duties on the M/V Sam Laud generally include assisting in the loading and unloading of cargo, mopping decks, cleaning windows, and painting. Olsen worked two four-hour watches—i.e. shifts—each day. His was the 4:00 to 8:00 watch, meaning that Olsen was on duty for these hours in both the morning and the evening. Overtime was apparently a regular occurrence. However, the ship's second mate testified at trial that Olsen could have declined overtime if he wished, and that if Olsen was experiencing illness or fatigue he could have quit working at any time.

**2.** Olsen contends that Dr. Sterenberg originally listed him as unfit for duty on a form provided by American Steamship, but changed the diagnosis at the request of the ship's captain. There is absolutely no support for this contention in the record.

**3.** Olsen insisted this was not a hyperbolic figure. The ship's two engines were running and, thus, the stacks were in use. He was using a special, high-temperature paint "you can use for hot things like your blacking of your wood stoves or such."

and after about a half hour or so of painting, he and his watchman agreed that "this is too much and we kind of wrapped 'er up." Olsen went to the ship's fantail to cool off but cannot remember if he performed any other duties on that watch. The next thing he can remember is helping to tie up the ship as it unloaded cargo, from about 8:00 p.m. to 4:00 a.m., at Zilwaulkee, Michigan. This was a difficult task, requiring Olsen and at least one other crewman to row ashore repeatedly—in this case in the rain—and find a tree, rock, or "official spile" to tie onto, and then row back. After this task was completed, Olsen worked his regular morning watch.

From Zilwaulkee, the ship sailed to East Tawas, Michigan, which is four or five hours away. Still feeling sick, Olsen requested vacation time. He called his girlfriend Laura Standen, who was in Petoskey, Michigan, and asked her to pick him up. She testified that when she arrived, she wanted to take him to the hospital that night, but he refused. Olsen promised her, however, that he would go in the morning if still not feeling well. They drove back to Petoskey that night, and the next morning, July 8, he went to Northern Michigan Hospital. Doctors there diagnosed him as being in the throes of a heart attack. Olsen had open-heart surgery. Since then, he has been unable to work as a seaman or perform any other physical labor.

Olsen filed this lawsuit on September 23, 1996, alleging that the M/V Sam Laud was unseaworthy and that the American Steamship Co. violated its duty to provide prompt and adequate medical care to Olsen. On November 10, 1997, the district court held a final pretrial conference and signed off on the parties' Proposed Joint Pretrial Order. The court ordered the parties to submit pretrial briefs, and they did so on December 1, 1997. The parties also each submitted proposed jury instructions and a statement of the case. A jury trial began on December 15, 1997. The jury returned a verdict in favor of the defendant on December 17, 1997. This timely appeal followed.

## II.

The main issue in this appeal is whether the district court erred by limiting the testimony of Dr. Helen H. Winkler, one of Olsen's expert witnesses. Specifically, the court did not allow Dr. Winkler to answer three questions relating to potential negligence on the part of Dr. Sterenberg: (1) "[T]o an internist, what do [the symptoms that Olsen presented at North Ottawa Community Hospital] classically represent;" (2) "Would it have been prudent to have an EKG administered at that time;" and, (3) in reference to Dr. Sterenberg's certifying Olsen fit for duty, should "a person presenting ... the symptoms as you've described, as well as the knowledge of the tests that were not performed ... be returned to work with those conditions present." The district court concluded that Dr. Sterenberg's negligence was not properly before the jury and that the questions posed were therefore irrelevant.

 "A trial court's decision to exclude evidence is reviewed for abuse of discretion." *Sutkiewicz v. Monroe County Sheriff,* 110 F.3d 352, 357 (6th Cir.1997). This court will not disturb the discretion of the trial court "unless the reviewing court finds that the ruling excluding the evidence is not only erroneous but results in substantial injustice to the aggrieved party." *Id.* In order to evaluate whether the district court so erred, we must first briefly examine various admiralty law causes of action. There are three causes of action generally available to a seaman who becomes sick or injured while in service of his or her vessel. First, the seaman may bring an action for maintenance and cure, in which he or she seeks wages plus reimbursement for medicine, treatment, and other expenses relating to his injury. This is admiralty law's original remedy; similar ones are found in the Laws of Oleron, published in the 12th Century, and in other ancient codes. *See Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 543, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); 1B *Benedict on Admiralty,* § 41 et. seq. (1997). Olsen did

not bring such a claim here, however. Second, the seaman may bring an unseaworthiness action, a strict liability claim alleging that the defendant shipowner failed to provide a vessel reasonably fit for its intended use. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 25–26, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); *Mitchell*, 362 U.S. at 543–49 (providing an excellent history of the unseaworthiness action); *see generally* 1B *Benedict on Admiralty*, §§ 23–31 (1997). Olsen brought an unseaworthiness claim, but it is not relevant to the exclusion of Dr. Winkler's testimony.

 Finally—and this is relevant—a seaman may bring a negligence action under the Jones Act, 46 U.S.C.App. § 688.[4] *See generally* 1B *Benedict on Admiralty*, §§ 21–22 (1997) (noting that although the cause of action has assumed less importance since the rise of the warranty of seaworthiness in the 1950's and 1960's, "Jones Act negligence is not, however, dead"). A shipowner owes several duties to a ship's crew; chief among them for the purposes of this case is the duty to provide prompt and adequate medical care to a sick or injured crewman. *See Garay v. Carnival Cruise Line, Inc.*, 904 F.2d 1527, 1533 (11th Cir.1990); *De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 140 (5th Cir.1986); *Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 685 (10th Cir.1981); *Fitzgerald v. A.L. Burbank & Co.*, 451 F.2d 670, 679 (2nd Cir.1971).

Its measure depends upon the circumstances of each case—the seriousness of the injury or illness and the availability of aid. Although there may be no duty to the seaman to carry a physician, the circumstances may be such as to require reasonable measures to get him to one, as by turning back, putting into the nearest port although not one of call, hailing a passing ship, or taking other measures of considerable cost in time and money.

*De Zon v. American President Lines*, 318 U.S. 660, 667, 63 S.Ct. 814, 87 L.Ed. 1065 (1943); *Joyce*, 651 F.2d at 684. The shipowner's potential liability does not end once the owner gets a crewman to treatment, however. If a ship carries a doctor, the shipowner is vicariously liable for the physician's negligence. *See De Zon*, 318 U.S. at 665. Similarly, the shipowner is liable for the negligence of an on-shore physician that it hires to treat a crewman. *See De Centeno*, 798 F.2d at 140 (shipowner liable where vessel's agent arranged for De Centeno to see local physician who negligently failed to recognize De Centeno's signs of diabetes and therefore failed to order blood test, where proper diagnosis could have avoided diabetic coma and death); *Fitzgerald*, 451 F.2d at 679 (stating that shipowner is liable for the negligence of the doctor it selects); *Central Gulf S.S. Corp. v. Sambula*, 405 F.2d 291, 299 (5th Cir.1968) (shipowner liable for negligently selecting general practitioner, rather than ophthalmologist, who misdiagnosed and mistreated plaintiff's eye injury); *Maritime Overseas Corp. v. United States*, 433 F.Supp. 419, 421 (N.D.Cal. 1977) ("Doctors who are hired by the ship-

---

4. The Jones Act "makes applicable to seamen injured in the course of their employment the provisions of the Federal Employers' Liability Act [FELA], 45 U.S.C. §§ 51–60, which gives to railroad employees a right of recovery for injuries resulting from the negligence of their employer, its agents, or employees." *De Zon v. American President Lines*, 318 U.S. 660, 665, 63 S.Ct. 814, 87 L.Ed. 1065 (1943). Specifically, the Jones Act's 46 U.S.C.App. § 688 provides that:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply.

FELA's 45 U.S.C. § 51, in turn, provides that: Every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its ... equipment.

owner to provide care for seamen are ... agents of the shipowner, and the shipowner is liable for the malpractice of the doctor."); *cf. Garay*, 904 F.2d at 1533 (noting that although plaintiff had alleged failure to provide prompt and adequate care, plaintiff had not alleged that treatment provided was "negligent or inadequate").

■■ To recapitulate, then, there are two ways that a shipowner can violate the duty to provide prompt and adequate medical care: directly, such as when the shipowner fails to get a crewman to a doctor when it is reasonably necessary and the ship is reasonably able to do so; and vicariously, when the shipowner selects a doctor who acts negligently. The questions that the district court excluded relate solely to the latter theory. The reason that we conclude that the district court did not err in excluding these questions is that Olsen's attorneys inexplicably[5] developed only the former theory before they called Dr. Winkler to the stand.

Olsen's complaint generally alleged that "Defendant owed plaintiff the duty of providing medical care subsequent to Plaintiff's myocardial infarction" and that "Defendant failed to provide prompt and adequate medical care resulting in delay of medical treatment and subsequent aggravation of injury." We will assume, without so deciding, that under the rules of notice pleading that this broad averment was sufficient to raise a claim for either direct or vicarious breach of defendant's duty to provide prompt and adequate medical care. *See* Fed.R.Civ.P. 8(a). The parties' proposed pretrial order, which the court adopted, was as vague as Olsen's complaint—it listed as an issue for trial "[w]hether the Defendant ... was negligent in the manner claimed by Plaintiff." None of Olsen's later submissions to the district court, however, even obliquely alleged negligence on the part of Dr. Sterenberg. Because, as

the district court noted, Olsen's complaint was "really very sketchy,"[6] the court requested pretrial briefs two weeks before trial "so [the judge would] know what this case was about." Plaintiff's pretrial brief focused solely on the direct theory of failure to provide medical care. It states:

> Mr. Olsen was stricken at approximately 2:00 p.m. on July 5th while in the port of Waukegon, Illinois. No medical treatment was rendered to him until the vessel reached Grand Haven, Michigan, ten (10) hours later. Bruce Dunlap, the mate in charge at the time Mr. Olsen became ill, testified that he checked on Mr. Olsen only one time in the interim. Following emergency room treatment in Grand Haven, Plaintiff was put back to work and no further treatment was rendered notwithstanding his continuing complaints. The medical evidence is clear: Plaintiff's heart attack was the result of his hard physical labor in the intervening days he remained aboard Defendant's vessel. Plaintiff is entitled to compensation is allowed [sic] for pain and suffering during the delay caused by Defendant shipowner's failure to render medical attention to an injured seaman.

Plaintiff's statement of the case alleges that "Defendant's vessel the M/V Sam Laud was not seaworthy as a result of Defendant's failure to provide crewmen equal and competent to their calling to ensure that Plaintiff had adequate and timely medical assistance with an opportunity to recuperate pursuant to the instructions of the emergency room doctor prior to engaging in further duties." The document seems to imply, then, that Dr. Sterenberg's treatment was in fact *not* negligent—it asserts that the defendant's breach was failing to follow Dr. Sterenberg's instructions with regard to rest for Olsen. Plaintiff's proposed jury instruc-

---

**5.** "Inexplicably" because, in an October 7, 1997 letter, Dr. Winkler informed plaintiff's Jaques Admiralty Law Firm that she was prepared to testify that Olsen in fact suffered a heart attack on July 5, 1994—i.e., *before* he

was treated by Dr. Sterenberg, who found only dehydration.

**6.** To which Olsen's counsel responded, "I know."

tions do not mention medical care at all—in either the negligence or the seaworthiness instructions.[7] Furthermore, plaintiff's opening statement did not allege or imply that Dr. Sterenberg had done anything wrong, and plaintiff never moved to amend the statement of the case or any other submission.

In this light, the district court properly determined that Dr. Winkler's proffered testimony was not relevant to the issues presented at trial. This court's decision in *McKinney v. Galvin,* 701 F.2d 584 (6th Cir.1983), is instructive. McKinney's complaint alleged several causes of action, including false arrest, excessive use of force, illegal search and seizure, and malicious prosecution. McKinney did not advance his malicious prosecution claim in either the joint pretrial statement or in his theory of the case. "Consequently, the District Court considered the claim[ ] abandoned under Fed.R.Civ.P. 16." *Id.* at 585–86. This court upheld the district court's determination, noting that "[a] party's failure to advance theories of recovery in the pre-trial statement constitutes waiver." *Id.* at 586 n. 3. This court also upheld the district court's exclusion of evidence that McKinney had been acquitted of the charge for which he was arrested—a malicious prosecution claim would have required proof of a favorable disposition on the charge—on the ground that the evidence was more prejudicial than probative. *See id.* at 586.

In the present case, Olsen's complaint advanced a vague claim for breach of the duty to provide prompt and adequate medical care. The pretrial order contains an even more vague reference to negligence. However, the district court asked the plaintiff to submit a trial brief specifically detailing his claim. Olsen did so, but the brief contained no reference to vicarious liability. Rather, the brief focused on the shipowner's alleged direct breach of duty. Vicarious liability is also notably absent

from Olsen's statement of the case and proposed jury instructions. Under *McKinney,* the district court was entitled to conclude that to the extent that Olsen's complaint stated such a claim, he waived it before trial. Therefore, also under *McKinney,* the district court was entitled to conclude that Dr. Winkler's testimony relating to Dr. Sterenberg's possible negligence was not relevant to the case.

### III.

Olsen raises several other issues that we can deal with briefly. Olsen contends that the district court erred by allowing defendant, over the plaintiff's objection, to refer in defendant's closing argument to the lack of evidence as to Dr. Sterenberg's negligence. Olsen contends that "[a] litigant is unduly prejudiced when his opponent is successful in preventing the admission of evidence on a particularly crucial issue in dispute, and then points to the absence of such evidence in closing argument." We find no evidence in the record, however, that the defendant made the sort of reference Olsen alleges. Next, Olsen contends that the district court committed reversible error by improperly interjecting the issue of workers' compensation into the trial and refusing to give a curative instruction. The district court twice before the jury uttered the words "workers' compensation," but never stated or implied that Olsen had received workers' compensation. The district judge in no way implicated the collateral source rule, and thus Olsen is not entitled to a new trial on this ground. Finally, Olsen contends that the district court erred by failing to give an instruction indicating that assumption of risk was not a defense in the case. A plaintiff's comparative negligence can lessen a shipowner's liability under the Jones Act, but assumption of risk is not a defense. *See Socony–Vacuum Oil Co. v.*

---

7. The instructions never specifically state what plaintiff alleges was unseaworthy about the M/V Sam Laud, though they do define seaworthiness generally. The instructions provide that, with regard to negligence, plaintiff alleges that defendant "failed to provide safe decking" and to keep the deck "free of foreign oil."

*Smith,* 305 U.S. 424, 431, 59 S.Ct. 262, 83 L.Ed. 265 (1939); *Burden v. Evansville Materials, Inc.,* 840 F.2d 343, 346 (6th Cir.1988). In this case, the district judge properly gave a comparative negligence instruction. While it is reversible error to "mask an assumption of risk charge in the garb of contributory negligence," *Furka v. Great Lakes Dredge & Dock Co.,* 755 F.2d 1085, 1090 (4th Cir.1985), that did not happen here.

### IV.

For the foregoing reasons, the judgment of the district court is **AFFIRMED** in all respects.