Filed 7/21/15  Kirkland v. Manson Construction Co./Dutra Dredging Co. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SHAWN KIRKLAND,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>MANSON CONSTRUCTION CO./DUTRA DREDGING COMPANY, a Joint Venture,<br><br>        Defendant and Respondent. | A139940<br><br>(Alameda County<br>Super. Ct. No. RG1053799) |

Shawn Kirkland injured his shoulder in June 2007, while employed as a dredgerman for Manson Construction Co./Dutra Dredging Company, a Joint Venture (Manson).  He sued Manson for, among other things, negligence under the Jones Act (46 U.S.C. § 30104), and claimed Manson failed to provide a safe work place.  He also asserted that the work Manson assigned him after he was injured and its failure to heed the advice and recommendations of his doctors caused him further physical impairment.  Subsequently, Kirkland filed an amended complaint and added allegations that Manson did not provide him with competent, postinjury medical care.

Manson moved to strike Kirkland's negligent medical care allegations from his first amended complaint for being untimely; Manson contended these claims did not relate back to Kirkland's original complaint.  The trial court granted Manson's motion and thereafter barred Kirkland from introducing at trial evidence of medical negligence; it also refused to give the jury Kirkland's proffered instruction that doctors are agents of

1

shipowners when the employer shipowner contracts with a doctor to treat an employee seaman injured on the job.  After hearing all the admitted evidence, the jury found Manson not negligent under the Jones Act.

The pivotal issue raised by Kirkland's appeal is whether he should have had the opportunity to present his medical negligence claims to the jury.  We conclude that the trial court erred when it struck these claims as they relate back to Kirkland's original complaint.  The trial court's erroneous ruling on the relation-back doctrine resulted in the additional prejudicial errors of excluding evidence directly relevant to these claims and rejecting Kirkland's agency instruction.  Accordingly, we reverse and remand for a new trial consistent with this opinion.

## BACKGROUND

This lawsuit involves Kirkland's claim of negligence under the Jones Act against his employer, Manson.  Kirkland, a dredgerman, worked for Manson from February 2007, until March 17, 2008.

### The Pleadings and Manson's Motion to Strike

Kirkland filed his original complaint against Manson on September 10, 2010, alleging negligence under the Jones Act, unseaworthiness, maintenance and cure, and vessel owner negligence.  Kirkland asserted that on October 3, 2007, while sitting astride a dredge pipe when working as a member of the crew of the dredge barge H.R. Morris, he injured his neck, back, shoulder, and arms when a defective chain binder that he was tightening broke (the chain binder incident).  He claimed Manson was negligent for failing to inspect, maintain, equip, and operate the vessels properly; failing to provide a safe place to work; failing to provide safe equipment; failing to provide competent and adequate crews; and failing to superintend and supervise work adequately.

Kirkland's complaint further alleged that his injuries were "aggravated and accelerated" on March 15, 2008, while working as a member of the crew of the Super Booster Barge.  He reiterated allegations similar to those set forth in his claim regarding the chain binder incident and added that Manson failed to give him work tasks and

2

assignments within his physical capabilities and failed to heed the advice and recommendations of Kirkland's health care providers.

On February 16, 2012, at Kirkland's deposition, counsel for Kirkland realized that the chain binder incident did not occur on October 3, 2007, as stated in the original pleading, but actually happened in June 2007. Kirkland requested leave to amend his complaint, which the trial court granted.

On April 25, 2012, Kirkland filed a first amended complaint, which set forth causes of action for negligence under the Jones Act, unseaworthiness, and maintenance, found, and cure. The amended complaint asserted that Kirkland injured his shoulder in the chain binder incident in June 2007, and further alleged that from and after September 11, 2007, Manson "failed to provide [Kirkland] with competent, postinjury medical providers" and "failed to provide [Kirkland] with competent, postinjury medical care." Kirkland pled that Manson failed to heed the advice and recommendations of Kirkland's health care providers, sent him back to work despite knowing he was not physically capable of doing the work, assigned him to work Manson knew or should have known exposed him to an unreasonable risk of harm, failed to give him work assignments that were suitable for him, and failed to give him work tasks and assignments that were within his physical capabilities. As a result of Manson's acts, Kirkland, according to the pleading, suffered severe and "permanent de novo injuries." Kirkland incorporated these allegations into his third cause of action for maintenance, found, and cure.

Manson moved pursuant to Code of Civil Procedure sections 435 et seq. to strike allegations in Kirkland's first amended complaint, including those asserting that Manson failed to provide him with competent, postinjury medical providers and medical care. Manson argued that the original pleading claimed a failure to provide a safe place to work and the newly added medical negligence claims did not relate back.

On July 19, 2012, the trial court signed the order granting in part Manson's motion to strike.[1] The court found that the three-year statute of limitations barred Kirkland's medical negligence claims, since his first amended complaint was filed on April 25, 2012, more than three years after his last day of work, and did not relate back to the claims in his original complaint. In rejecting the application of the relation-back doctrine, the court explained that the medical negligence allegations "do not rest on the same general set of facts or involve the same instrumentality as the injuries alleged in the original complaint. [Citation.] A claim for failure to provide competent postinjury medical care is not based on the same facts, [does not involve the same injury and does not allege the same instrumentality] as a claim for failure to provide a safe workplace, as was alleged in [Kirkland's] original complaint."

Kirkland filed a petition for a writ of mandate with this court, seeking to reverse the granting of Manson's motion to strike. On November 12, 2012, we summarily denied this petition.

***Manson's Motion In Limine and Kirkland's Requested Instructions***

In the trial court, Manson filed a motion in limine to exclude Kirkland's medical expert from testifying that Kirkland did not receive appropriate medical care and that his physicians should have known unrestricted duty as a dredge worker was beyond his physical capacity. The court granted this motion.

Kirkland requested a negligent assignment instruction[2] and an instruction that a doctor engaged by a shipowner (like Manson) to examine or care for a seaman (like

---

[1] The trial court denied Manson's motion to strike Kirkland's allegation that Manson sent him back to work when he was not capable of doing the work and his assertion that he suffered severe and permanent de novo injuries.

[2] Kirkland requested the following instruction: "A Jones Act employer has a legal duty to assign employees to work for which they are reasonably suited. A Jones Act employer violates that duty if it negligently assigns an employee to perform work beyond his capacity. The employer is negligent if it knew or should have known that its assignment exposed the employee to an unreasonable risk of harm. [¶] Where a physician certifies the employee as fit to return to heavy labor, it is not the employee's burden to show malpractice by the examining physician, rather it is sufficient to show

4

Kirkland) is an employee of Manson (agency instruction).[3]  The trial court refused Kirkland's request to provide the jury with these instructions, and instructed the jury with the following:  "To recover for negligent assignment under the Jones Act, the plaintiff must prove that the employer knew of his injury and nevertheless assigned him to unsuitable work.  Simply assigning the plaintiff to his job, without more, is insufficient to establish liability—the plaintiff must prove that his employer negligently assigned him to work it knew or should have known was beyond his diminished work capacity and would aggravate his physical condition.  Recovery, if any, is limited to the worsening of the plaintiff's injury between his medical release to full duty work on October 10, 2007, through mid-March, 2008, when he stopped working for Manson/Dutra."

Kirkland's claim for negligence under the Jones Act proceeded to trial.[4]

***Evidence of Kirkland's Character and Prior Injuries***

At trial, Manson presented evidence regarding Kirkland's character and prior injuries.  Kirkland acknowledged that he previously had a Coast Guard's 100-ton master captain's license, which permitted him to command or operate barges weighing up to 100 tons.  On January 29, 2001, he pled guilty to two felony counts for manufacture of a controlled substance (cocaine) and for delivery of a controlled substance (marijuana).  Subsequently, Kirkland relinquished his captain's license at the Coast Guard's request.

---

that the Jones Act employer knew or should have known that the employee was unfit for the work because of his condition."

[3] Kirkland asked the court to give the following agency instruction:  "Any doctor or physician whom a corporation, like the Manson Construction Co. or the Dutra Dredging Co., engages to examine or care for a seaman, like Shawn Kirkland, is held in law to be an employee of that corporation."

[4] Without providing this court with any record citation, Manson asserts in its appellate brief that Kirkland dropped the seaworthiness cause of action before the case went to the jury; Kirkland does not dispute this in his reply brief.  Kirkland states in his opening appellate brief that his maintenance and cure claim was that Manson's negligence aggravated his personal injury and " 'overlap[ped]' with the parallel Jones Act claim."

Kirkland testified that on October 27, 2004, while working as a marine construction hand for Tutor-Saliba Construction (Tutor-Saliba), he fell off a crane and injured himself. He continued to work until February 12, 2005, but his condition deteriorated. He saw 15 different doctors and pursued a workers' compensation claim against Tutor-Saliba.

On July 20, 2005, Kirkland completed an "Employee's Permanent Disability Questionnaire." On this same date, Dr. Aubrey A. Swartz, an orthopedic surgeon, examined Kirkland. He noted that Kirkland fell off a crane while working on the Richmond-San Rafael Bridge. Kirkland told Dr. Swartz that he injured his neck, lower back, right elbow, right shoulder, and both hands. Kirkland continued to work for approximately six to eight weeks after the injury, but his condition deteriorated and he gradually lost strength in his right hand; ultimately, Kirkland did not work for almost two years. Dr. Swartz concluded that Kirkland had a permanent disability from his usual occupation.

In January 2006, Dr. Douglas Stone Musgrave performed carpal tunnel surgery on Kirkland's right wrist; he performed this same surgery on Kirkland's left wrist in February 2006. Dr. Musgrave wrote on February 16, 2006: "[Kirkland] reiterates all of his problems with his worker's compensation carrier. He states that he has extensive ongoing legal battles. He and his lawyer wish for me to make a statement reinforcing the relationship between his hand symptoms and injury on [November 27, 2004]. He states that he later was using his left hand while at work and had symptoms in his left hand. He states that they have 'ruined him,' and ruined his credit for the next seven years. . . . [Kirkland] has some mild subjective stiffness or soreness in his knuckles, but states that his numbness and tingling has improved." He further stated: "I have reinforced to him that I am not able to establish the relationship between his carpal tunnel syndrome and his previous work injury one and a half years ago. That would be for the doctors present at the time to establish. . . ."

6

***Kirkland's Employment with Manson***

On February 20, 2007, Kirkland began working for Manson as a dredge deck mate for its project entitled "3E." Eric McMann was the operations manager for Manson and in charge of the 3E project.

On the first day of his employment, Kirkland completed a "Safety/Health Questionnaire." He left blank the questions asking him whether he had ever injured his neck, back, shoulder, elbow, wrist, hand, hip, knee, ankle, or foot, and did not provide any response when asked to explain any injury for the questions that he had answered, "Yes." He also left blank the question asking him whether he had ever received a disability rating.

McMann testified that whenever a person reported having a history of lower back, neck, shoulder, wrist, hand, or knee problems on the safety questionnaire, he sent the person to a doctor for an opinion as to whether that person could to do the work Manson wanted him to do. If not cleared by the doctor to do this type of work, McMann would not hire the person. If the person indicated on the questionnaire a previous determination of a permanent disability from construction work, McMann would not hire the person.

***The 2007 Chain Binder Incident and Kirkland's Medical Treatment and Work Assignments Until Mid-March 2008***

Kirkland spent his first six months on the 3E project working on the suction dredge, H.R. Morris. In June 2007, while working on the H.R. Morris, Kirkland injured his shoulder when a defective chain binder that he was tightening broke while he was sitting astride a dredge pipe. No accident report was ever filed regarding this injury and Manson's regional safety manager, McMann, and Kirkland's supervisors did not recall Kirkland's reporting this incident. Kirkland continued working through August, and then took a month's vacation in September.

When Kirkland returned to work on October 1, 2007, Manson assigned him to a crew helping to build and prepare the suction dredge, Super Booster, in Rio Vista, California. After two days, he felt pain in his shoulder, but tried to work through it. On October 5, 2007, Kirkland told his supervisor, John Dreitlein, that his hand was swollen.

Dreitlein sent Kirkland to Sutter Delta Medical Center in Antioch and called Loretta Murrell, Manson's safety officer, to report Kirkland's injury. Murrell drove to the medical center; Kirkland was in the emergency room and was being treated by Dr. Mary Fitzsimons.

Dr. Fitzsimons diagnosed Kirkland with acute arthritis in his shoulder. She ordered an intramuscular injection of Toradol, which is a nonsteroidal anti-inflammatory drug, and prescribed Vicodin and Motrin. Kirkland told her that he had been doing heavy work the preceding week and she treated his shoulder as if it were an occupational injury. Dr. Fitzsimons testified that Murrell asked her "not to place the patient off work, but that [Murrell] would take the patient immediately to the workers' comp[ensation] physician." Dr. Fitzsimons did not take Kirkland off duty and expected that he would be immediately taken to an occupational health provider.

Murrell testified that she knew Kirkland wanted to work because he was very concerned about income. She added: "And I knew that there was not an incident that precipitated the event. And, therefore, I felt the best care for him would be to work with an occupational specialist that could give him physical therapy . . . ." Murrell arranged to have Dr. Daniel Ferrick at the Solano Regional Medical Center in Rio Vista see Kirkland.

Dr. Ferrick wrote that Kirkland could not "actively abduct" his left arm beyond 30 degrees because of the pain. His assessment was that Kirkland had "[l]eft shoulder pain, almost like an overuse syndrome, [and had an] obvious strain." He set forth a plan to have Kirkland rest and ice his shoulder over the weekend. Dr. Ferrick stated, "We will have him try to go back to work on [October 8, 2007, Monday], but he is not to use his left arm until I reevaluate him in one week."

Dreitlein first testified that Kirkland returned to work the afternoon of his injury on October 5, 2007, but later elaborated that he was not certain whether Kirkland came back to work that day or the following day, Saturday, October 6. McMann instructed Dreitlein to assign Kirkland to the lightest duty available. Dreitlein assigned Kirkland to use a cutting torch to flush off or burn off trip hazards on the deck of the Super Booster, which was not heavy work. The following Monday and Tuesday, Kirkland also

8

performed light duty work. Kirkland continued to work on the Super Booster project until November 2007.

Kirkland had scheduled a visit with Dr. Ferrick on October 12, 2007, but it was cancelled. Murrell could not recall whether she had cancelled the visit but acknowledged that she arranged for Kirkland to see Dr. Steven A. Gest on October 10, 2007. Dr. Gest is the founder and the medical director of the Emeryville Occupational Medical Clinic (the Clinic), which was about 54 miles from Kirkland's Rio Vista work site. Dr. Gest had made a trip to Manson's Richmond office to solicit business from Murrell, and Manson was one of the Clinic's regular client customers in 2007. Murrell testified that she "had very good results from" Dr. Gest.

At Kirkland's visit with Dr. Gest on October 10, 2007, Kirkland told the doctor that his activities at Manson involved pulling, lifting, or overhead use of his arms, which tended to aggravate his pain. Dr. Gest examined Kirkland and observed that his acromioclavicular joint, which is in the shoulder, was tender. He also noted signs of a shoulder impingement, which "is a functional problem of the shoulder that results in pain." He gave Kirkland an injection of Lodin, an anti-inflammatory, and ordered an MRI. Dr. Gest released Kirkland to full duty without restrictions based on his history, physical exam, and non-operative shoulder.

Kirkland returned to work. McMann put Kirkland on one of the dredge tenders, which was the lightest duty on the project.

Kirkland had a second appointment with Dr. Gest on October 17, 2007. Dr. Gest had reviewed Kirkland's MRI report, which indicated a tendinopathy-related change and mild fraying of the distal supraspinatus tendon. Kirkland's MRI also revealed arthritic changes in the acromoioclavicular joints that were suggestive of a mild impingement syndrome. Kirkland told Dr. Gest that he had improved and was currently working at full duty. Dr. Gest diagnosed Kirkland with a left shoulder rotator cuff and biceps tendon strain and ordered six sessions of physical therapy. He released Kirkland to full duty without any restrictions, and set an appointment with him for November 7, 2007.

Kirkland missed his November appointment with Dr. Gest. He did not see Dr. Gest again until March 5, 2008. Kirkland testified that he could not make his appointments because he was not released from work.

Kirkland began his physical therapy on February 4, 2008. Kirkland reported that he had good and bad days but that he was definitely feeling better with the therapy.

Kirkland saw Dr. Gest on March 5, 2008. Since Kirkland had not fully improved, Dr. Gest referred him to an orthopedic surgeon. Dr. Gest was concerned about a possible left rotator cuff tear. He released Kirkland to full duty without any restriction because Kirkland had been functioning at full duty on his job.

McMann testified that between October 17, 2007, and the beginning of March 2008, Kirkland never indicated to him that he was having physical problems. In the middle of March 2008, Kirkland told him that his shoulders were hurting him and that he did not think he could continue working. McMann took him off the boat.

***Kirkland's Medical Treatment on and after March 17, 2008***

On March 17, 2008, Kirkland went to the Clinic for walk-in service and complained for the first time about right shoulder pain. Dr. Paul Perchonock saw him. He took Kirkland off work and told him to keep ice on his shoulder and to schedule a follow-up visit in two days with Dr. Gest. Dr. Perchonock requested an MRI authorization for Kirkland. He stated that Kirkland was overusing his right arm to compensate for a left shoulder rotator cuff tear.

Two days later, on March 19, 2008, Kirkland saw Dr. Gest. He injected Kirkland's left shoulder with a combination of a corticosteroid and "a fast-acting local anesthetic like Liocaine." He placed Kirkland on very light work; he was not to do any overhead work and was not to lift more than five pounds.

Kirkland saw Dr. Perchonock on March 24, 2008. Dr. Perchonock observed that Kirkland had improved but his range of motion for his right arm was still limited. He diagnosed Kirkland as having a right shoulder sprain.

Kirkland's employment ended and his care was transferred to Dr. Douglas Bald, an orthopedic surgeon practicing in Kirkland's home state of Oregon. Dr. Bald saw

10

Kirkland on May 5, 2008. He performed one surgery on Kirkland's right shoulder and two surgeries on his left shoulder.

Manson's expert orthopedic surgeon, Dr. Jim D. Kelly, II, examined Kirkland in October 2011. He diagnosed Kirkland with chronic posttraumatic impingement syndrome. He reviewed the MRI of Kirkland's left shoulder and concluded that it showed tendinosis; it did not show any rotator cuff tendon full thickness tear. Dr. Kelly stated that tendinosis was not from an acute traumatic injury but "more of an age-related change and more consistent with a . . . longstanding development." He also concluded that Kirkland's problems with his right shoulder were the result of cumulative trauma and age-related degenerative change.

Dr. Frank Mainzer, Manson's expert radiologist, reviewed Kirkland's imaging studies and medical records. He concluded that the images of Kirkland's shoulders demonstrated that none of the changes or abnormalities was caused by a single event or injury. He stated that Kirkland "has a congenital or born-with abnormality that predisposes him to get shoulder problems." He also explained that his findings showed that Kirkland's problems were also caused by chronic repetitive use.

***Verdict and Notice of Appeal***

After 16 days of trial, including testimony by over 20 witnesses, the jury deliberated for a little more than one hour and unanimously found in a special verdict that Manson was not negligent under the Jones Act.

Kirkland filed a motion for new trial, which the court denied on September 20, 2013. Kirkland filed a timely notice of appeal.

## DISCUSSION

### I. *Negligence Under the Jones Act*

State and federal courts have concurrent jurisdiction in Jones Act and general maritime law cases. (*Donaldson v. National Marine, Inc.* (2005) 35 Cal.4th 503, 508-511.) State courts apply federal substantive law in deciding such cases. (28 U.S.C. § 1333; *Baptiste v. Superior Court* (1980) 106 Cal.App.3d 87, 94.)

11

"The Jones Act was passed in 1920 as the Merchant Marine Act to extend the protections of the Federal Employers' Liability Act ( . . . 45 U.S.C. § 51 et seq.) to seamen.  The act provides seamen or their survivors a remedy against employers for negligence resulting in injury or death in the course of employment.  [Citation.]" (*Donaldson v. National Marine, Inc., supra,* 35 Cal.4th at p. 508.)  Under this Act (46 U.S.C. § 30104), an employer has a duty to provide a safe place for a seaman to work. (*Colbrun v. Bunge Towing, Inc.* (5th Cir. 1989) 883 F.2d 372, 374.)  To recover for negligence under the Jones Act, the plaintiff must establish that the employer was negligent and that this negligence "was a cause, however slight, of [plaintiff's] injuries." (*Havens v. F/T Polar Mist* (9th Cir. 1993) 996 F.2d 215, 218.)  "The term 'negligence' as used in the Jones Act is given a liberal interpretation, and includes any conscious or careless breach of the employer's obligation to provide for the safety of the crew. [Citation.]  An established duty falling on employers of seamen is that they shall use due diligence to provide their employees with a safe place in which to work, and in this respect a higher standard is required of them than of employers of workers on shore." (*Rouchleau v. Silva* (1950) 35 Cal.2d 355, 361.)

In addition to having the duty to provide a safe workplace, shipowners have "the duty to provide proper medical treatment for seamen falling ill or suffering injury in the service of the ship."  (See *Fitzgerald v. A.L. Burbank & Co.* (2nd Cir. 1971) 451 F.2d 670, 679 (*Fitzgerald*); see also 46 U.S.C. § 668.)  This obligation is an implied provision in contracts of marine employment.  (*Aguilar v. Standard Oil Co. of N.J.* (1943) 318 U.S. 724, 730.)  In exercising this duty, the shipowner may be negligent "in improperly providing for a seaman's care, including the negligent selection of a doctor . . . ." (*Fitzgerald,* at p. 679.)  "The shipowner's potential liability does not end once the owner gets the crewman to treatment . . . .  If a ship carries a doctor, the shipowner is vicariously liable for the physician's negligence.  [Citation.]  Similarly, the shipowner is liable for the negligence of an on-shore physician that it hires to treat a crewman."  (*Olsen v. American S.S. Co.* (6th Cir. 1999) 176 F.3d 891, 895; see also *De Zon v. American President Lines* (1943) 318 U.S. 660, 668 ["The doctor in treating the seaman [is]

12

engaged in the shipowner's business"].)  The seaman must show that the negligent medical care was the proximate cause of the injury.  (*Fitzgerald,* at p. 681.)

A claim for maintenance and cure concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship. (*Lewis v. Lewis & Clark Marine, Inc.* (2001) 531 U.S. 438, 441.)  "The duty to provide maintenance and cure embraces not only the obligation to provide a subsistence allowance and to pay for medical expenses actually incurred by the seaman, but to take all reasonable steps to ensure that the seaman, when he is injured or becomes ill, receives proper care and treatment."  (*Gaspard v. Taylor Diving & Salvage Co., Inc.* (5th Cir. 1981) 649 F.2d 372, 375.)  "If an unreasonable failure to provide maintenance and cure aggravates the seaman's condition, the shipowner is liable not only for the increased medical expenses and maintenance that may become necessary, but also for the full tort damages that result."  (*Ibid.*)  "Thus, . . . , a seaman whose injuries are aggravated by a negligent failure to provide appropriate care on board ship has overlapping causes of action.  He can recover full tort damages under either a count for negligence under the Jones Act or a count for breach of the maritime duty of maintenance and cure."  (*Id.* at pp. 375-376.)

## II.  *Manson's Motion to Strike and the Relation-Back Doctrine*

In his first amended complaint filed April 25, 2012, Kirkland added the allegations that following the chain binder incident and until mid-March 2008, Manson failed to provide him with competent health care providers or competent postinjury medical care. He does not dispute that the statute of limitations for maritime personal injury actions is three years (46 U.S.C. § 30104) or that he filed his first amended complaint after the statute of limitations had expired.  He contends, however, that his medical negligence claims were preserved under the relation-back doctrine because he filed his original complaint on September 10, 2010, within the three-year statute of limitations.  He argues the trial court erred when it granted Manson's motion to strike the portion of his pleading relating to medical negligence.

13

**A.** *Standard of Review*

The parties disagree over the proper standard of review. Kirkland argues that the trial court's ruling should be reviewed de novo and Manson maintains the correct standard of review is abuse of discretion.

Generally, "[a]n order striking all or part of a pleading under Code of Civil Procedure section 435 et seq. is reviewed for abuse of discretion." (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1282 (*Quiroz*).) However, the question whether the allegations in the amended pleading relate back to the original pleading requires the application of a legal doctrine to undisputed facts, rather than the exercise of discretionary judgment by the trial court, and we therefore review the trial court's decision de novo. (See, e.g., *Brumley v. FDCC California, Inc.* (2007) 156 Cal.App.4th 312, 318; *San Diego Gas & Electric Co. v. Superior Court* (2007) 146 Cal.App.4th 1545, 1549; *Tamburina v. Combined Ins. Co. of America* (2007) 147 Cal.App.4th 323, 328; see also *In re Charlisse C.* (2008) 45 Cal.4th 145, 159 ["As to the trial court's conclusions of law, . . . review is de novo; a disposition that rests on an error of law constitutes an abuse of discretion"].)

**B.** *The Relation-Back Doctrine and Kirkland's Medical Negligence Claims*

"The relation-back doctrine deems a later-filed pleading to have been filed at the time of an earlier complaint which met the applicable limitations period, thus avoiding the bar. In order for the relation-back doctrine to apply, 'the amended complaint must (1) rest on the *same general set of facts,* (2) involve the *same injury,* and (3) refer to the *same instrumentality,* as the original one.' " (*Quiroz, supra,* 140 Cal.App.4th at p. 1278.) "An amended complaint relates back to an earlier complaint if it is based on the same general set of facts, even if the plaintiff alleges a different legal theory or new cause of action." (*Pointe San Diego Residential Community, L.P. v. Procopio, Cory, Hargreaves & Savitch, LLP* (2011) 195 Cal.App.4th 265, 277 (*Pointe San Diego*); see also *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 584 [widow of man shot by police sued for wrongful death, and alleged officers intentionally killed her husband; amended complaint adding a second cause of action for negligence by the city in continuing to employ officers

14

knowing they were dangerous related back to original complaint]; *Austin v. Massachusetts Bonding & Ins. Co.* (1961) 56 Cal.2d 596, 601 ["The rule which makes relation back of an amendment dependent upon whether recovery is sought on the same general set of facts as those alleged in the original complaint is in accordance with the basic principle of code pleading that a litigant need only allege the facts warranting recovery"].)

The critical question is whether the original pleading provided the defendant with adequate notice of the claim. (*Pointe San Diego, supra,* 195 Cal.App.4th at p. 277.) A complaint that fails to provide any information to the defendant about the nature of the plaintiff's claim will not trigger the relation-back doctrine. (*Davaloo v. State Farm Ins. Co.* (2005) 135 Cal.App.4th 409, 416-418.) " 'The policy behind statutes of limitations is to put defendants on notice of the need to defend against a claim in time to prepare a fair defense on the merits.' " (*Pointe San Diego,* at p. 277.) Additionally, when applying the relation-back analysis, "courts should consider the 'strong policy in this state that cases should be decided on their merits.' [Citations.]" (*Ibid.*)

Both Kirkland and Manson cite *Pointe San Diego, supra,* 195 Cal.App.4th 265 as authority in support of their respective positions. In *Pointe San Diego,* the original complaint included a single cause of action for " 'General Negligence,' " and alleged that within the last year, " 'Defendants, as Plaintiffs' attorneys, failed to use due care' " in the handling of real estate litigation. (*Id.* at p. 271.) Plaintiffs filed numerous amended complaints, which set forth specific examples of how the attorneys had allegedly breached the standard of care. (*Id.* at pp. 271-272.) The trial court found that a number of the claims were time barred and concluded that these claims did not relate back to the original complaint "because it was 'void of operative facts[.]' " (*Id.* at p. 273.) The Court of Appeal reversed, concluding that the malpractice was based on a single litigation matter and the original pleading set forth the title of that litigation, putting the defendants "on notice that the professional negligence claim was based on its representation of plaintiffs in this case, and of the need to gather and preserve evidence relating to this representation." (*Id.* at p. 278.) The court elaborated, "Although the original complaint

15

did not detail *how* the firm had allegedly breached the standard of care, the form complaint and the fourth amended complaint rested on the same general set of facts . . . , involved the same injury (monetary damages sustained as a result of alleged professional negligence), and referred to the same instrumentality (alleged professional negligence)." (*Ibid.*)

In the present case, Kirkland's original complaint stated that Kirkland suffered an injury in a chain binder incident while working on the dredge barge H.R. Morris, because Manson failed to provide Kirkland with a safe workplace. The pleading further alleged under both the negligence and maintenance and cure causes of action that in March 2008, Kirkland's injuries were aggravated while working on the Super Booster barge because Manson, among other things, failed to provide Kirkland with a safe work environment, failed to give him tasks and assignments within his physical capabilities, and "failed to heed the advice and recommendations of [Kirkland's] health care providers." These latter allegations were not based on an unsafe place to work, but on the failure "to care for the seaman taken ill or disabled during a voyage or during the course of his maritime employment." (*Crooks v. United States* (9th Cir. 1972) 459 F.2d 631, 632, fn. omitted.) This obligation arises at the time of injury and continues "until cure (or the closest possible approach to cure) ha[s] been obtained." (*Id.* at p. 633.)

The amended complaint added allegations that Manson failed to provide Kirkland with competent, postinjury medical providers and medical care. The medical negligence claims were predicated on the same set of critical facts underlying the allegations in the original complaint: Manson's failure to meet its obligation to cure Kirkland's shoulder injury following the chain binder accident. Thus, similarly to the situation in *Pointe San Diego, supra,* 195 Cal.App.4th 268, Kirkland's original complaint put Manson on notice that the negligence and cure claims were based on the medical professional's advice and "of the need to gather and preserve evidence relating to [the doctors'] representations." (*Id.* at p. 278.)

Applying the relation-back test (see, e.g., *Quiroz, supra,* 140 Cal.App.4th at p. 1278), we conclude Kirkland's first amended complaint related back to his original

16

complaint:  His original and amended complaints rested on the same general set of facts—the advice of Kirkland's doctors and the work assignments Manson gave him following the chain binder incident.  They involved the same injury—Kirkland's shoulder injury and the aggravation and exacerbation of that injury.  They referred to the same instrumentality—the alleged failure "to take all reasonable steps to ensure that the seaman, when he is injured or becomes ill, receives proper care and treatment." (*Gaspard v. Taylor Diving & Salvage Co., Inc., supra,* 649 F.2d at p. 375.)

Manson argues that the instrumentality of the injury in the original complaint was Manson's alleged failure to follow the treating physician's medical advice in assigning that work, which was inconsistent with the allegations in his second pleading that Manson was negligent for providing him with medical care.  Relying on *Kim v. The Regents of University of California* (2000) 80 Cal.App.4th 160 (*Kim*) and *Coronet Manufacturing Co. v. Superior Court* (1979) 90 Cal.App.3d 342 (*Coronet*), Manson asserts that Kirkland's characterization that the pleadings were based on the same general facts and the same instrumentality is too broad.[5]

---

[5]  Manson also relies on *Moore v. Baker* (11th Cir. 1993) 989 F.2d 1129 (*Moore*), which held that the plaintiff's claim that the defendant physician was negligent during and after performing brain surgery did not relate back to the plaintiff's claim that the defendant committed medical malpractice by failing to inform the plaintiff of a non-surgical alternative.  (*Id.* at p. 1131.)  The court concluded that the original complaint focused on the defendant's actions before the plaintiff decided to undergo surgery and the amended complaint focused on the defendant's actions during and after the surgery. "The alleged acts of negligence occurred at different times and involved separate and distinct conduct."  (*Id.* at p. 1132.)

Other federal courts have disagreed with *Moore,* viewing the surgery as a whole; they hold that malpractice and informed consent claims arise from the occurrence of surgery.  (See, e.g., *Hartley v. Dombrowski* (D.D.C. 2010) 744 F.Supp.2d 328, 335.) These decisions conclude that the defendants in these cases were, as a practical matter, on notice of the plaintiffs' new informed consent claims even if the original complaints failed to allege the specific facts of the claims.  (*Ibid.*)

We need not address whether we agree with the reasoning in *Moore* because the claims in Kirkland's amended complaint, unlike the situation in *Moore,* arose from the same conduct, transactions, or occurrences alleged as grounds for recovery in the original pleading.  As already discussed, Kirkland's pleading did not simply allege Manson's

17

In *Kim, supra,* 80 Cal.App.4th 160, the court held that the relation-back doctrine did not apply because the amended complaint alleging wrongful termination based on age discrimination did not arise out of same set of facts set forth in the claims for breach of contract and Labor Code violations in the original complaint. (*Id.* at p. 169.) The court observed that both pleadings concerned one employer and one termination of employment, but the amended complaint, unlike the original one, was based on facts related to disparate treatment, intentional discrimination, the plaintiff's age, and/or comments related to the plaintiff's age. (*Ibid.*)

The initial complaint in *Coronet, supra,* 90 Cal.App.3d 342 alleged electrocution due to a defective hair dryer and the amended complaint asserted electrocution by a switch on the table lamp. (*Id.* at p. 347.) The court concluded that these were different accidents but noted that the relation-back doctrine could possibly apply if the plaintiff could allege that the hair dryer was connected to the lamp's switch and socket. If such facts could be alleged, the amended complaint would be referring to the same accident, i.e., use of the hair dryer and its components and would be based on the same general set of facts. (*Id.* at pp. 347-348.)

The present case is distinguishable from *Kim, supra,* 80 Cal.App.4th 160 and *Coronet, supra,* 90 Cal.App.3d 342. Both of Kirkland's pleadings were based on Manson's failure to take reasonable steps to provide Kirkland with the proper care and treatment after Kirkland was injured in the chain binder incident and Kirkland's medical treatment was part of the chain of causation that led to Kirkland's exacerbated injuries identified in the original complaint. Both of Kirkland's pleadings were based on the work assignments and medical care Manson gave him after the chain binder incident, and the exacerbation of his shoulder injury.

---

negligence based on its failure to provide a safe work environment, but also alleged that Manson did not heed the doctors' warnings and assigned him to work that was beyond his physical capability, exacerbating his initial injury. In Kirkland's amended complaint, no " 'new or distinct conduct, transactions, or occurrences [were] alleged as grounds for recovery.' " (*Moore, supra,* 989 F.2d at p. 1131.) Kirkland's medical treatment was at issue in both of his pleadings.

Manson correctly points out that the critical issue when determining the application of the relation-back doctrine is whether the defendant had notice of the new claims. Manson argues it did not have notice of the medical negligence claims and proving or disproving these claims requires entirely new and different evidence. (See *Percy v. San Francisco General Hospital* (9th Cir. 1988) 841 F.2d 975, 978 [in determining whether a claim relates back, "the court compares the original complaint with the amended complaint and decides whether the claim to be added will likely be proved by the 'same kind of evidence' offered in support of the original pleading"].) We disagree. In our view, Kirkland's original complaint provided Manson with sufficient notice to garner and preserve evidence related to Kirkland's work assignments and medical care following his injury. In other words, the facts needed to prove liability in the original pleading based on the claim that Manson assigned Kirkland work beyond his physical capabilities and did not heed the doctors' advice were the same facts necessary to show liability in the amended complaint that the doctor's advice was negligent.

We conclude the record shows that Kirkland's original complaint provided Manson with adequate notice to begin to prepare a defense; Manson could have reasonably foreseen the later allegations of medical negligence. (See *Pointe San Diego, supra,* 195 Cal.App.4th at p. 279.) Accordingly, the trial court erred when it granted Manson's motion to strike the medical negligence claims as being untimely and not relating back to Kirkland's original complaint.

### III. *Instructional and Evidentiary Errors*

The trial court barred Kirkland from introducing any evidence that the medical providers should have known the postinjury work assignments Manson gave Kirkland exceeded his physical capacity. It also refused to give Kirkland's proffered instruction that a physician hired by Manson to treat or examine its seaman is Manson's employee.[6] Kirkland maintains that these rulings amounted to a partial directed verdict on his

---

[6] See footnote 3, *ante*, for the agency instruction Kirkland requested.

negligent entrustment claim.[7] Manson responds that since the trial court had stricken Kirkland's medical negligence claims, the question of the medical providers' competence and their relationship to Manson were not material to the case.

The trial court's initial error of striking the medical negligence allegations from Kirkland's first amended complaint resulted in its rejecting Kirkland's agency instruction,[8] and excluding his evidence of medical negligence.[9] None of the instructions given told the jurors that a "shipowner is liable for the negligence of an on-shore physician that it hires to treat a crewman" (*Olsen v. American S.S. Co., supra,* 176 F.3d at p. 895), and the question of agency is usually a question of fact for the jury as long as there is an evidentiary basis for its consideration (*Glynn v. Roy Al Boat Management Corp.* (9th Cir. 1995) 57 F.3d 1495, 1498, overruled on other grounds by *Atlantic Sounding Co., Inc. v. Townsend* (2009) 557 U.S. 404; see also *Dunn v. Conemaugh & Black Lick R.R.* (3rd Cir. 1959) 267 F.2d 571, 575-576). These rulings improperly deprived Kirkland of having the jury determine Manson's liability for negligence under the Jones Act based on providing Kirkland with negligent medical care and/or medical providers.

If the instructional or evidentiary errors are harmless, the judgment will not be reversed. An evidentiary error is not reversible unless " ' "it is reasonably probable a result more favorable to the appellant would have been reached absent the error." ' " (*Tudor Ranches, Inc. v. State Comp. Ins. Fund, supra,* 65 Cal.App.4th at pp. 1431-1432.) "A judgment may not be reversed for instructional error in a civil case 'unless, after an

---

[7] We need not determine whether the refusal to instruct on agency amounted to a directed verdict because we conclude the trial court, under instructional error analysis, committed prejudicial error.

[8] "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) "The propriety of jury instructions is a question of law that we review de novo." (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

[9] The standard of review for evidentiary rulings is abuse of discretion. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431-1432.)

20

examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 580.) " ' "A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. [Citation.]" [Citation.]' " (*Freeze v. Lost Isle Partners* (2002) 96 Cal.App.4th 45, 53.)

Manson argues any alleged error was harmless and cites evidence showing that Kirkland had prior medical problems, that he failed to follow his doctors' recommendations after the chain binder incident, and that he missed physical therapy and doctor appointments. Manson emphasizes that Kirkland lacked credibility: Kirkland provided different dates for the chain binder incident; he testified falsely that Manson returned him to full, heavy work after suffering his shoulder injury; he testified falsely that he walked around in a sling following the chain binder incident; he admitted that he had completed a form prior to his job with Manson stating that he believed he was completely disabled; he testified that he never learned that Dr. Swartz had confirmed that he was permanently disabled and this testimony was incredible; and he did not disclose his prior medical problems on his employment application with Manson.

The foregoing evidence does not establish that a jury could not have found Manson negligent under the Jones Act based on the treatment Kirkland received from Dr. Gest. Kirkland's evidence was more than sufficient to entitle him to an instruction on agency. The record indicates that Dr. Gest had made a trip to Manson's office to solicit business from Murrell. Murrell testified that she referred Kirkland to Dr. Gest and that she had experienced "very good results from" Dr. Gest. She referred Kirkland to Dr. Gest even though his Clinic was located in Emeryville and Kirkland was working in Rio Vista, about 54 miles away.

Manson stresses Kirkland's lack of credibility and medical problems prior to his job with Manson but this evidence was not dispositive; it did not bar Kirkland's medical negligence claims. (See, e.g., *Gypsum Carrier, Inc. v. Handelsman* (9th Cir. 1962) 307 F.2d 525, 530 [a seaman who suffers injury " 'in the course of his "employment" as a seaman, within the ordinary meaning of those words, is not barred from suit under the Jones Act because he conceals a material fact in applying for employment' "].) The jury never considered the adequacy of the medical care provided Kirkland and the record contains evidence that Dr. Gest's care was negligent. Despite knowing Kirkland did physically demanding work, Dr. Gest released him to full duty without any restrictions.

More significantly, the trial court barred critical testimony. Dr. Bald, Kirkland's orthopedic surgeon, was not permitted to testify on the standards of care applicable to Dr. Gest's treatment of Kirkland. Dr. Gideon Letz, an expert in occupational medicine and public health, was prepared to testify that Kirkland had not received competent or suitable medical care or suitable work assignments on and after October 5, 2007. Dr. Letz had concluded that the physicians treating Kirkland's shoulder injury should "have known that unrestricted duty as a dredge worker was beyond his physical capacity when they returned him to work in October 2007."

The jury never considered Kirkland's claims that Dr. Gest was Manson's agent and that Dr. Gest knew or should have known that returning Kirkland to work would exacerbate his injury. Moreover, the jury did not hear evidence directly related to his medical negligence claims. Accordingly, we conclude after a review of the evidence and consideration of the entire case that the instructional and evidentiary errors resulted in a miscarriage of justice.

## DISPOSITION

The trial court is directed to vacate its order granting Manson's motion to strike Kirkland's medical negligence allegations and enter an order denying this motion. The judgment is reversed and the matter is remanded for a new trial consistent with this opinion. Manson is to pay the costs of appeal.

22

_____

Kline, P. J.

We concur:


_____

Richman, J.


_____

Miller, J.


A139940

23